IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNIVERSITY OF ILLINOIS BOARD OF TRUSTEES, GENE E. ROBINSON, *Interim Dean of College of Liberal Arts & Sciences, sued in his official capacity*, STEPHEN BRYAN, *Associate Vice Chancellor and Dean of Student Support and Advocacy, sued in his official capacity*, JUSTIN BROWN, *Associate Dean of Students, sued in his official capacity*,<br><br>                    Defendants. | Civil Action No. _____ |

## **COMPLAINT**

John Doe,[1] by and through undersigned counsel, files this complaint against Defendants University of Illinois Board of Trustees (the "Board"), Gene E. Robinson (Interim Dean of the College of Liberal Arts and Sciences), Stephen Bryan (Associate Vice Chancellor and Dean of Student Support and Advocacy), Justin Brown (Associate Dean of Students). Defendants Robinson, Bryan, and Brown are collectively "Individual Defendants" (but are sued, as noted in the caption, only in their official capacities). Mr. Doe brings claims against the Board for gender-based discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"), and against Individual Defendants for depriving him of his

---

[1] Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding under the pseudonym "John Doe" and identifies his accuser as "Jane Roe." He identifies student witnesses by their initials.

procedural due process rights, in violation of 42 U.S.C. § 1983.  In support of his complaint,
John Doe states as follows:

<u>**SUMMARY OF ALLEGATIONS**</u>

1.　　　On August 18, 2020, John Doe—a sophomore honors student with a 3.97 GPA—
was dismissed from the University of Illinois after a hearing panel (the "Panel") found him
responsible for "sexual assault" under the University of Illinois Student Code (the "Code").

2.　　　The allegation?  Not that Ms. Roe had not consented to *intercourse*—she herself
would later admit to the Hearing Panel that "there was clearly consent" for that—but that she had
not consented to a particular position they used during otherwise-consensual intercourse.

3.　　　The Panel's decision made no sense. It flew in the face of a staggering amount of
evidence that John Doe was innocent and that Ms. Roe's allegations were false.  Every single
piece of documentary evidence supported Mr. Doe's innocence.  Text Messages.  Snapchats.
Class Attendance records.  Photographs.  And more.  All of it contradicted Ms. Roe's account of
her sexual encounter with Mr. Doe and her reaction to it.

4.　　　The documents also supported the notion that Ms. Roe falsely accused Mr. Doe of
sexual assault—six months after the sexual encounter—because she was upset he did not pursue
a relationship with her (as he said he would) after their sexual encounter.

5.　　　For example, Ms. Roe said that *immediately* after her sexual encounter with Mr.
Doe, she "was just so clearly in shock and very confused.  So [she] immediately contacted [her]
roommate" to tell her what had just happened.  **But here's the text message that Ms. Roe
actually sent her roommate (and that her roommate, *not Ms. Roe*, provided to
investigators):**

ROE:  When r u coming back

ROE [Mr. Doe] is tryna lmaoooooooooooo

U.Z.:  Lmaooooo class until 3

U.Z.:  Idk if I'll have to stop by before going to the Halloween store

ROE:  BITCH

ROE:  I CANT BELIEVE

ROE:  OUR SUITEMATES HEARD

U.Z.:  WHAT

U.Z.  howwwwww do you know

Ms. Roe didn't tell her friend she was "in shock" and "very confused" as a result of having just been sexually assaulted—she sent her friend a message joking about how her suitemates probably heard her and Mr. Doe having sex.

6.      And it wasn't just the documentary evidence (like that text) that the Panel had to ignore in order to find Mr. Doe responsible for sexual assault—there was also testimony from numerous witnesses, *all of whom were friends of Ms. Roe*, that contradicted Ms. Roe's account.

7.      By far the most significant of these witnesses—and a witness who was identified not by Mr. Doe, *but by Ms. Roe herself*—was S.A., a friend and sorority sister of Ms. Roe. S.A. saw Ms. Roe at a kickball tournament just a few hours after the alleged assault. S.A. was reluctant to speak with the investigators and asked them who would see the report, as she was concerned about what she was going to reveal about what Ms. Roe told her then: namely, that **she and Mr. Doe "got together" and "I think he wants me to go to semi with him." S.A. described Ms. Roe as "really excited about that."**

8.      S.A. also told the Investigators that it was only weeks later, after Mr. Doe had stopped communicating with Ms. Roe, that Ms. Roe's "attitude about the incident had shifted."

And *even then*, Ms. Roe didn't tell S.A. that Mr. Doe had sexually assaulted her, but simply that she was uncomfortable engaging in a particular sexual position with him.  In fact, Ms. Roe specifically told S.A. that she "didn't say no or tell him to stop."

9.      Faced with this blockbuster evidence from Ms. Roe's own friend and witness, the Panel would—as Mr. Doe will outline in more detail below—subsequently do everything it could to undermine S.A.'s credibility.  And when it couldn't do that, it just ignored her.

10.     That the Panel was biased against Mr. Doe was evident from the beginning of his hearing.  Fewer than ten minutes into the proceeding, before Mr. Doe even had a chance to speak, the student member of the Panel asked why Mr. Doe wasn't *also* facing a charge of sexual harassment—because, said the Panel Member, it "seems that complainant has struggled in the university community since the incident" and that should qualify as "sexual harassment" under the Code.  The Panel Member, in short, assumed Mr. Doe's guilt before the hearing had even started.

11.     But it didn't end there.  **To give just one example: Both Mr. Doe and Ms. Roe initially got the date of the incident wrong.  But incredibly,** *the Panel held that mistake only against Mr. Doe*, **finding that "[w]hen the actual date was identified, [Mr. Doe's] account of what occurred before the incident became false."**  Not only does holding the same mistake against the man but not the woman evince gender bias, but it is all the more nonsensical given how much more memorable an assault should have been (her version) than a months-ago one-night stand should have been (his version).

12.     The University, in short, bent over backward to find Mr. Doe guilty.  It forced him to play on a field that was obviously tilted against him.  But this should not have come as a surprise.  As a result of media attention regarding the University's previously lax response to

allegations of sexual misconduct, it has been under immense pressure to find male students guilty of sexual assault.

13.     This mindset is pervasive at the University, which holds "ManTalks" geared towards telling men to "end[] violence against women and femmes."  The website advertising those talks states, "Presented by the Student Assistance Center in the Office of the Dean of Students, Women's Resources Center, Office of University Counsel [!], Office for Access & Equity, and the University of Illinois Police."  *See*

https://wecare.illinois.edu/prevention/students/men/.

14.     There are, of course, no similarly themed "WomanTalks."

15.     The same gender bias that led the University of Illinois to teach that about its male students is what led it to make a gendered and irrational decision regarding Ms. Roe's charges.

## PARTIES

1.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a resident of the State of Illinois.  John Doe matriculated as a freshman at the University of Illinois at Urbana-Champaign ("University of Illinois," the "University," or "UIUC") in August 2019. He was dismissed from the University on August 18, 2020.

2.     Defendant University of Illinois Board of Trustees is a body corporate and politic having power, *inter alia*, to plead and be impleaded, to make and establish by-laws, and to alter or repeal the same as they shall deem necessary, for the management or government, in all its various departments and relations, of the University of Illinois, for the organization and endowment.  *See* 110 ILCS 305/1.

3.      Defendant Gene E. Robinson was the Interim Dean of the College of Liberal Arts & Sciences at the University at all times relevant to this complaint and acted under color of law. Robinson's responsibilities included, but were not limited to, ensuring the University of Illinois complied with applicable due process protections, as well as antidiscrimination laws, including, but not limited to, Title IX.  Robinson is named in his official capacity.

4.      Defendant Stephen Bryan was the University's Associate Vice Chancellor and Dean of Student Support & Advocacy at all times relevant to this complaint and acted under color of law.  Bryan's responsibilities included, but were not limited to, ensuring the University of Illinois complied with applicable due process protections, as well as antidiscrimination laws, including, but not limited to, Title IX.  Bryan is named in his official capacity.

5.      Defendant Justin Brown was the University's Associate Dean of Students and Director – Office for Student Conflict Resolution at all times relevant to this complaint and acted under color of law.  Brown's responsibilities included, but were not limited to, ensuring the University of Illinois complied with applicable due process protections, as well as antidiscrimination laws, including, but not limited to, Title IX.  Brown is named in his official capacity.

## JURISDICTION AND VENUE

6.      The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88, and 42 U.S.C. § 1983.

7.      Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

### COLLEGE POLICIES AND PROCEDURES

16.     Mr. Doe received and reviewed a copy of both the Code and the University of

Illinois Student Disciplinary Procedures (the "Policy") from the University.  The Code

establishes the rights and responsibilities for students attending the University of Illinois.  The

Policy described the procedures by which the University would investigate and adjudicate

alleged violations of its standards.  He relied on the rights guaranteed him under both the Code

and the Policy before enrolling at the University.

17.     In consideration for his tuition and attendance at the University of Illinois,

Mr. Doe received and was given assurances by the University that it would follow and comply

with numerous policies and procedures adopted and put forth by the school, including the Code

and the Policy.

18.     Under Illinois law, the Code and the Policy constitute contractual relationships

between the University and Mr. Doe.

19.     The Code guarantees Mr. Doe the same rights as any other citizen of the United

States.  It provides that:

> A student at the University of Illinois at the Urbana-Champaign
> campus is a member of a University community of which all
> members have at least the rights and responsibilities common to all
> citizens, free from institutional censorship; affiliation with the
> University as a student does not diminish the rights or
> responsibilities held by a student or any other community member
> as a citizen of larger communities of the state, the nation, and the
> world.

20.     The Code prohibits certain conduct by students at the University of Illinois,

including "Sexual Assault," which it defines as "any sexual contact that does not involve the

knowing consent of each person, including (A) any form of sexual penetration without consent."

21.     Separate from the Code, the Policy prescribes the procedures the University must follow when investigating and adjudicating claims of misconduct.

22.     When a report of sexual misconduct is made, the Executive Director assigns an investigator to conduct the investigation.

23.     The Policy does not require that the investigator receive annual training—or *any* training—in how to conduct impartial fact-finding proceedings.

24.     The first step in the investigation is for the investigator to interview the complaining party.

25.     After meeting with the complaining party, the investigator determines "whether the allegations, if substantiated, would violate" the Code.

26.     If the investigator determines that the allegations would violate the Code, the investigator "will issue a written allegation notice" to the respondent and complainant informing them of the following:

> (1) A detailed description, including the date (if known) and location (if known), of the alleged incident(s);
> (2) The identity (if known) of any complainants involved in the incident(s);
> (3) The section(s) of the Student Code that the respondent has been accused of violating;
> (4) A link to these procedures or an attached copy of these procedures;
> (5) An instruction for the respondent to call within five business days to schedule a meeting with the investigator. This meeting should occur within ten business days of the allegation notice, unless a conflict between the investigator's availability and the respondent's academic schedule require the meeting to be delayed further.
> (6) A statement that the university prohibits retaliation, knowingly making false statements to university officials, and knowingly submitting false information to university officials.

27.     The investigator will then conduct an investigation, including interviewing witnesses and collecting evidence.  The "anticipated duration of the investigation is 40 business days."

28.     At the conclusion of the investigation, the investigator will compile all evidence collected and allow both the complainant and respondent to submit written responses.

29.     The investigator will then "create an investigative report that fairly summarizes the investigation and the evidence" (the "Investigation Report").  The complainant and respondent will both have the opportunity to respond to the Investigation Report.

30.     Thereafter, a panel is appointed by the Executive Director.  The panel consists of three people chosen from among the members of the Subcommittee on Sexual Misconduct.  *Id*. at 36.  The Policy describes the pool of potential panelists as "trained university faculty, students and staff."  The Policy states that potential panelists receive "appropriate annual training, developed in consultation with the university's Title IX Coordinator, on sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, domestic violence, and the physiological and psychological effects of trauma."  The Policy does not say that potential panelists receive any training regarding impartiality, due process principles, or bias.

31.     The complainant and respondent are notified of the "date, time, and location of the hearing at least seven business days in advance."  The Policy does not state that the initial hearing date is final or cannot otherwise be rescheduled for good cause.

32.     In addition to the members of the Panel, the "Executive Director or their designee will advise the Panel and may participate in questioning and deliberation," but "[t]he investigator may not serve in this role."

33.     During the hearing, "[t]he investigator [is] present, but will leave the hearing room during deliberation."

34.     "Neither the complainant nor the respondent" are permitted to "question, or otherwise address, each other or any witness directly."  Instead, "they may suggest questions to

9

be posed by the Panel Chair.  The Panel Chair may choose not to ask a question if it has already

been answered, is irrelevant, or is inappropriate."  "The Panel Chair may also reword a relevant

question that is asked in an inappropriate manner."  The Policy provides no guidance regarding

what is or is not inappropriate.  Nor does it provide any mechanism for challenging the Panel

Chair's decision.

35.     Following the hearing, the panel enters into closed session to "find facts and

determine responsibility"; it "will make its decisions by simple majority vote and will apply the

preponderance [of the evidence] standard."  The Policy references "federal law and University

policy" but does not otherwise define the preponderance of the evidence standard.

36.     The Policy guarantees that "[a]ll disciplinary decisions will be made on an

objective evaluation of the evidence."

37.     Following the Panel's decision, "OSCR staff will provide email notification of the

Panel's decision, including a rationale."

38.     Appeals may be made only on the basis of:

(1) The investigation and/or the hearing was not conducted fairly or in conformity
with prescribed university procedures. The appellant must show that any alleged
bias or deviation from the Student Disciplinary Procedures, including this
appendix, is likely to have adversely affected the outcome of the original hearing.

(2) Any sanctions imposed by the Panel were not appropriate for the violation(s)
for which the student was found responsible.

(3) New, substantive information, sufficient to alter the decision, exists and was
clearly not available at the time of the original investigation and/or the hearing.

39.     In response to an appeal, the "Chair of SCSD or their designee will identify three

SCSD members . . . to consider [the] appeal[] of the Panel's decision."

40.     Neither the complaint nor the respondent is allowed to "attend the deliberations of the Appeal Committee," and "OSCR will communicate the decision to the respondent and complainant within five business days of the date the Appeal Committee reached its decision."

## PRESSURE ON THE UNIVERSITY OF ILLINOIS

41.     Mr. Doe's case did not occur in a vacuum.  Rather, the University of Illinois has been engulfed over the past several years in a firestorm of litigation and media pressure that resulted in the gender-biased treatment that Mr. Doe received.

42.     For example, in 2014, the University paid a settlement to a student who accused the University of Illinois of "minimizing her sexual assault and harassment complaints." https://www.chicagotribune.com/news/ct-university-of-illinois-sexual-assault-settlemen-20140927-story.html.  These allegations led to widespread media coverage and led the University of Illinois to change its Title IX policies.

43.     More recently, the University of Illinois was the subject of a 2019 exposé entitled "One Campus.  Seven Professors Facing Harassment Accusations.  Few Consequences."  As its title suggests, the *ProPublica* report identified seven professors at the University of Illinois who faced little to no discipline from the University despite allegations of sexual misconduct.

44.     The professors named in the piece included:

- Joseph Petry – Professor Petry was accused of offering grades to students in exchange for sex.  According to *ProPublica*, the University ultimately imposed "no formal discipline" and agreed to "discontinue its investigation into the allegation" as part of a deal it made with Professor Petry in April 2019.

- Mahir Saul – Professor Saul was accused of inappropriately touching multiple female students.  After finding the female students' claims to be true, Professor Saul was allowed to keep his position.

45.     The *ProPublica* report sparked criticism of the University of Illinois's administration and calls for reform.

46.     The University of Illinois is also facing ongoing litigation regarding allegations of misconduct by Professor Gary Xu.  As reported by the *Chicago Tribune*, two former female students and a professor at another school alleged that Professor Xu "assaulted, bullied and raped multiple students"—and that the University "did not adequately respond to what it knew about Xu's conduct."  https://www.chicagotribune.com/news/ct-university-of-illinois-professor-gary-xu-sexual-assault-lawsuit-20191226-37tilxpvmvcxlcqizzdhfgds2y-story.html.  The lawsuit claims that the University "was well aware of allegations against Xu years before it took action" but that UIUC "cast a blind eye" on Professor Xu's misconduct.

47.     In addition to its faculty, the University of Illinois has also found its administrators accused of sexual assault.  For example, in 2018, the *News-Gazette*, *ProPublica*, the *Knoxville News Sentinel*, and *NPR* all reported that eight female students accused former University administrator Lee Waldrep of sexual misconduct.

48.     This year, there has also been significant media attention on the case of a former University of Illinois Police Officer, who is facing multiple charges related to sexual assault.

49.     And in October 2019, a University of Illinois student went public with her story claiming that the school failed to appropriately respond to her claims that her ex-boyfriend, a former Illinois football player, physically abused her.

50.     Although the University found the football player responsible for abusing and stalking the complainant, it "came to the conclusion that . . . [the player] w[ould] be allowed to remain enrolled at the University with a dismissal held in abeyance sanction until he graduates." The complainant "voiced her frustration" to *The Daily Illini* about how the University mishandled her case, telling the student newspaper that "these authorities told [her] that [she was] not credible and . . . completely ignored all the things [she] went through."  And she did the

same in an October 30, 2019 interview with the local CBS News affiliate, which published

images of bruises all over her body, evidence of abuse that she claimed the University ignored.

## TITLE IX AT THE UNIVERSITY OF ILLINOIS

51.     Even prior to these reports and the ensuing public pressure it faced, the University

of Illinois's approach to sexual assault was infused with gender bias.

52.     For example, UIUC's sexual misconduct prevention and training program for all

students includes "Men & Masculinities" programming that examines masculinity in connection

with sexual assaults and involves discussions around "ending violence against women and

femmes, . . . intersectional feminisms, [and] consent." It conducts no similar programming

examining femininity in connection with sexual assaults or about ending violence against men.

53.     Starting with its training, which the University of Illinois offers as part of its "WE

CARE Sexual Misconduct Support, Response, and Prevention" program, it assumes that men are

sexually aggressive and female students must be protected from them. This sort of gender bias

pervades the University of Illinois's systems for investigating and adjudicating claims of sexual

assault.

## THE INCIDENT

54.     Sometime in September 2019, Mr. Doe and Ms. Roe met in a class they shared.

Mr. Doe and Ms. Roe were later assigned to work on a group project together for the class. The

group's first meeting took place on September 29, 2019.

55.     Shortly after the meeting, Mr. Doe and Ms. Roe exchanged Snapchat contact

information.

56.     Throughout October, Mr. Doe and Ms. Roe exchanged flirtatious messages in

person and via social media. The two discussed going to one another's sorority and fraternity

13

dances as the other's date.  Ms. Roe told her friends that she thought Mr. Doe was "attractive" and "nice."

57.     Mr. Doe eventually invited Ms. Roe to join him for lunch on October 25, 2020. Ms. Roe brought her friend A.Z., and Mr. Doe arrived with his friends, but Ms. Roe and Mr. Doe mostly talked to one another.

58.     One of the topics Mr. Doe and Ms. Roe discussed was how they had each decorated their respective dorm rooms.  So, after lunch, Ms. Roe invited Mr. Doe back to her room to show him her decorations.  When they arrived at Ms. Roe's room, Ms. Roe introduced Mr. Doe to her roommate, U.Z.  U.Z. then left for class.  Mr. Doe and Ms. Roe then made small talk for some time.  Mr. Doe commented on the pictures Ms. Roe had decorated her room with. After a short period of time, Mr. Doe and Ms. Roe began to kiss.  It was around this time that Ms. Roe texted U.Z.: "when r u coming back . . . [Mr. Doe] is tryna lmaooooooooooo."  In other words, Ms. Roe wanted to know when her roommate would return because she intended to engage in sexual activity with Mr. Doe and didn't want to be disturbed.

59.     After confirming that her roommate wouldn't be returning until 3 pm, Ms. Roe continued her sexual encounter with Mr. Doe.  Mr. Doe asked Ms. Roe for her consent each step of the way—to undress, to have sex, and to use protection—and Ms. Roe enthusiastically consented.  Ms. Roe herself does not contend that she did not consent to the sex, in fact, during the hearing, she told the Panel "there was clearly consent."

60.     The two proceeded to have sex for a period of time.  Mr. Doe then asked Ms. Roe if she wanted to have vaginal sex from behind (not anal sex), and they switched positions.  It is on this point that Mr. Doe and Ms. Roe's accounts differ.  According to Mr. Doe, he "asked her, and she said yes."  Ms. Roe gave varying accounts, including that she said  "no . . . definitely

14

more than once directly to his face" and that while "laughing" "in a light manner" told Mr. Doe "I don't do that."

61.     The pair then switched sexual positions again, with Ms. Roe on top, and continued having sex.  Mr. Doe climaxed in this position.

62.     After they had sex, Mr. Doe and Ms. Roe conversed in bed for 15-20 minutes. During this conversation, Mr. Doe asked Ms. Roe about her semicolon tattoo, which she said related to her struggles with mental health and suicidal ideation.

63.     This disclosure made Mr. Doe uncomfortable.  Although he had been interested in Ms. Roe as a romantic partner, as a first-year student focused on his studies, Mr. Doe was not interested in entering into a relationship with someone who had a history of serious mental health issues.  Mr. Doe knew that such a relationship would complicate his life and entail more responsibility than he was ready to accept at that point in his life.

64.     As a result, shortly after Ms. Roe made this disclosure, Mr. Doe told her he had to leave.  The two kissed and he left her room.

65.     **After Mr. Doe left, Ms. Roe texted U.Z.: "BITCH/I CANT BELIEVE/OUR SUITEMATES HEARD."**  This was the only text she sent that day to U.Z. or (upon information and belief) to anyone about what had just happened between her and Mr. Doe.

### THE INCIDENT IS REPORTED AND INVESTIGATED

66.     On April 24, 2020, six months after Mr. Doe and Ms. Roe had sex, Ms. Roe reported that Mr. Doe had sexually assaulted her.  Program Director Eric Gorecki and his supervisor, Dean Bob Wilczynski (the "Investigators"), were assigned to investigate Ms. Roe's allegations.

67.     Ms. Roe initially reported that the incident occurred on October 18, 2019. However, it was later determined that the incident occurred *a full week later*, on October 25, 2019.

68.     At no point during the investigation was Ms. Roe asked how she could fail to remember the date on which she was supposedly sexually assaulted.

69.     The Investigators first interviewed Mr. Doe on May 6, 2020, and conducted a second interview with Mr. Doe on June 8, 2020.  In total, the Investigators interviewed 12 people in connection with the investigation.

70.     On July 28, 2019, three months after the investigation began, the Investigators issued a final investigation report (the "Investigation Report").

71.     Although the Investigation Report did not present a conclusion or otherwise recommend a resolution, it included a section titled "Additional conflicting statements."

72.     Three of the four conflicting statements to which the Investigation Report called attention were statements made by Ms. Roe—not Mr. Doe.  And unlike the conflicting statement regarding Mr. Doe—which dealt with a later interaction he had at a bar with one of Ms. Roe's friends—Ms. Roe's three conflicting statements went to the heart of her allegations and her credibility.

73.     The first conflicting statement that the Investigators identified was that Ms. Roe told them that shortly after the sexual encounter, she told U.Z. that Mr. Doe had sexually assaulted her.  But according to U.Z., that did not happen.  Rather, U.Z. told the Investigators that when she got back to the room, Ms. Roe was "more focused on the potential of their suitemates being able to hear the sexual activities through an adjoined bathroom and that [Ms.

Roe] did not speak about the interaction with [Mr. Doe] negatively until" months later, when COVID-19 forced them all to go back home.

74.      The second conflicting statement that Investigators identified was testimony from S.A., a friend and sorority sister that Ms. Roe (not Mr. Doe) had identified as a witness.  As noted above, S.A. told the Investigators that when Ms. Roe told her about her sexual encounter with Mr. Doe, Ms. Roe was "really excited, she seemed hopeful," "but two weeks later when it came up again in early November she was upset."

75.      The last conflicting statement the Investigators noted was that Ms. Roe had told them she was not, and never had been, interested in pursuing a long-term relationship with Mr. Doe.  **The investigators do not appear to have believed her (emphasis added): "[Ms. Roe] has made several statements discovered throughout the investigation which indicate a desire for long term relationship with [Mr. Doe].  These statements conflicted with [Ms. Roe's] follow-up interview and response to the evidence packet.  When further contact did not happen after the 25th, [Ms. Roe] was not happy for being 'ghosted.'"**

**A. What Ms. Roe Told the Investigators**

76.      As the Investigators noted in their Report, what Ms. Roe told them conflicted with both the statements of her own witnesses and the documentary evidence that had been gathered. The common theme of Ms. Roe's conflicting statements was to paint her sex with Mr. Doe as something other than fully consensual—despite the witness and documentary evidence to the contrary.

77.      Ms. Roe said that Mr. Doe invited her to lunch on October 18, 2019.  (As noted above, she was off by a week.)  During lunch, the two discussed room decorations, and Mr. Doe asked to see Ms. Roe's.

78.     Ms. Roe said that she invited Mr. Doe to her room because her "roommate was home."  *Id*.  Ms. Roe stated that when she brought Mr. Doe to her room, U.Z. was "supposed to stay," and [i]t wasn't supposed to happen that way."

79.     It is not believable that Ms. Roe did not know her roommate would have class at this time.  They were, after all, college roommates and would have become accustomed to each other's schedules by this point in the semester.

80.     Even though U.Z. had left "unexpectedly," Ms. Roe made no effort to keep U.Z. from leaving or usher Mr. Doe out of her room.  Instead, they continued talking.

81.     Ms. Roe testified that after about eight minutes of flirtatious conversation, Mr. Doe kissed her.  The pair kissed for several minutes.  Ms. Roe admitted that this was consensual.

82.     According to Ms. Roe, she did not remember how her clothes were removed but did not claim that she failed to consent to their removal.

83.     At some point, Ms. Roe texted U.Z.:

Roe:  when r u coming back

Roe:  [Doe] is tryna

Roe:  lmaoooooooooo

U.Z.:  Lmaooooo class until 3

U.Z.:  IDK if I'll have to stop by before going to the Halloween store

84.     Ms. Roe never told the Investigators that she took the time to make sure U.Z. would not return while she was engaging in sexual activity with Mr. Doe.  Disclosing this would undermine the story Ms. Roe was telling the Investigators and reveal that she was an active and enthusiastic participant in the sexual encounter.  This text exchange came to light only because U.Z. submitted it to the Investigators.

85.     Ms. Roe told Investigators that she and Mr. Doe then began to have sex.  She told the Investigators that she consented to each of these actions: the kissing, removal of clothing, and the sex.

86.     Ms. Roe initially said that she provided "action based" consent to those things. *Id*.  But later in her interview, she told the Investigators:

> He thinks everything was consensual.  Never I am consenting to this, but it could look unspoken and assumed.  That could be the reason he believes that I consented up to that point.

87.     So during the same interview, Ms. Roe gave the Investigators drastically different accounts of whether or not she provided consent.  First, she told the Investigators that although she never provided verbal consent to any of the sexual conduct, she did provide *non-verbal* consent.  However, Ms. Roe then told the Investigators that her consent "could look unspoken," but "[n]ever am I consenting."

88.     Ms. Roe told the Investigators that at some point during the sex, Mr. Doe asked if she would move onto her stomach so they could have sex from behind.  According to Ms. Roe she responded "no . . . definitely more than once directly to his face."

89.     Ms. Roe then described Mr. Doe as becoming "annoyed and irritated" while continuing to have sex with her.

90.     Ms. Roe said that Mr. Doe, despite *asking for and being granted* consent every step of the way, "[s]uddenly, he forcibly turned me around and laid me on my stomach and continued to penetrate me."  According to Ms. Roe, she "felt trapped because [Mr. Doe's] hands were pushing down [on Ms. Roe] with force."

91.     In her first interview, Ms. Roe told the Investigators that after Mr. Doe climaxed, he asked her if "it was good," to which she responded in the "yeah I guess."  Mr. Doe, she said,

immediately left her dorm room.  She did not say anything about her leaving the room and coming back, or about their having a conversation before Mr. Doe himself left.

92.     But during Ms. Roe's second interview, she told the Investigators that after Mr. Doe asked her if it was good, Ms. Roe "ran to the bathroom to get dressed and allow him time to leave the room."  When Ms. Roe returned, Mr. Doe was still in her room.  Ms. Roe testified that he then asked her "if it was good" a second time.

93.     After being prompted by the Investigators, Ms. Roe went on to describe having an exchange with Mr. Doe regarding her semicolon tattoo, saying that it represented "being a survivor of suicide and depression."

94.     Ms. Roe told the Investigators that U.Z. was the first person she told about the incident.  The other witnesses she said she told were A.Z., M.G., and S.A.

95.     Ms. Roe testified that, following the sexual encounter, she was so upset that she did not attend the class she shared with Mr. Doe for two weeks.  *Id*. at 10.  When the Investigators later pulled the attendance records for that class, the records showed that she had never missed a class.

96.     Mr. Doe said that when Mr. Doe sat next to her in class two weeks later, he asked what was wrong.  According to Ms. Roe, she responded, "you got what you wanted now leave me alone."  *Id*. at 10.  By her own admission, she did not say anything about assault.

97.     The Investigators asked Ms. Roe about the Snapchat she sent to Mr. Doe on March 26, 2020 that read in part (emphasis added):

> **i did not appreciate your lack of communication with me afterwards**, especially when **you told me you wanted to invite me to delts events and asked to come to my semi**. After what had happened I clearly was in a state of shock, seeing as how you completely **used me**.

98.    Ms. Roe told the Investigators that she began her message to her alleged assailant by voicing frustration about him not pursuing a relationship with her as "just call[ing] him out for making things up to get in my pants.  Like it was a rouse [*sic*]."

**B. Doe's Investigation Testimony**

99.    When Mr. Doe was interviewed, he told investigators that the incident could not have occurred on October 18th as Ms. Roe claimed.  Mr. Doe knew that the incident could not have occurred on October 18th because he had "lunch with his cousin" that day.  As a result, he believed that it must have occurred the next day, October 19, 2019.  (It never occurred to him that someone could be a full *week* off about the date on which she was supposedly sexually assaulted.)

100.    Mr. Doe said that on the morning of the sexual encounter, he had a beer at a business fraternity event before going to class.

101.    Mr. Doe testified that he invited Ms. Roe to lunch, and afterwards, she suggested they "could go to [her] room."

102.    Mr. Doe told Investigators that he and Ms. Roe talked for around ten minutes in her room before she "leaned in to begin kissing."  Mr. Doe then asked to take Ms. Roe's shirt off and she "verbally said yes."  After kissing some more, Mr. Doe asked if Ms. Roe would like to have sex with a condom.  Again, Ms. Roe said yes.

103.    Mr. Doe and Ms. Roe began having sex in the missionary position.  Mr. Doe then asked Ms. Roe if they could try having sex from behind.  Ms. Roe told him they could.  After having sex from behind for some period of time, they transitioned to Ms. Roe being on top.

104.    After Mr. Doe climaxed, he and Ms. Roe made small talk and told jokes for approximately 15-20 minutes.  Mr. Doe told the Investigators it was a "normal conversation

about class, about different Snaps, professors, and friends." Mr. Doe described the conversation as "very comfortable."

105. It was during this conversation that Ms. Roe told Mr. Doe about her semicolon tattoo, and that it symbolized her struggles with mental illness. Mr. Doe testified that Ms. Roe's sharing her mental health issues made him uncomfortable, and that Mr. Doe told Ms. Roe "[he] had to get back to [his] room" shortly thereafter.

106. As Mr. Doe was leaving, Ms. Roe kissed him goodbye.

107. Mr. Doe told the Investigators that following the sexual encounter, he purposefully avoided contact with Ms. Roe, both in person and through social media. This was because Ms. Roe's disclosure about her mental health issues made him uncomfortable and he did not want to pursue a romantic relationship with her. But after two weeks of putting space between them, he sat next to Mr. Doe in their shared class.

108. Mr. Doe said that Ms. Roe told him "you ghosted me" and that he should "never… talk to [her] again." She did not say anything about assault.

109. Mr. Doe complied with Ms. Roe's request, and had no contact with her until she sent him the March 26, 2020 Snapchat almost five months later. When he received Ms. Roe's message accusing him of sexual assault, Mr. Doe's "heart dropped . . . [he] told his parents, [he] didn't respond."

**C. Testimony of Roe's Friends After the Incident**

110. Ms. Roe told Investigators that they should interview A.Z., U.Z., S.A., M.M., and T.M. in connection with their investigation.

111. Investigators first interviewed A.Z. A.Z. was good friends with Ms. Roe and, prior to attending University of Illinois, attended the same high school as Ms. Roe.

112.    A.Z. told investigators that Ms. Roe talked to her about the incident the morning after it occurred.  Ms. Roe told A.Z. that Mr. Doe "pressur[ed Ms. Roe] and was aggressive." Ms. Roe never mentioned anything about assault.  A.Z. added that at some point later, Ms. Roe complained that Mr. Doe was not responding to Ms. Roe's "texts or snaps."  Ms. Roe was frustrated that Mr. Doe was "still active on social media but would avoid returning contact."

113.    Investigators then interviewed M.M., a friend and sorority sister of Ms. Roe. M.M. told investigators that she was the first person Ms. Roe talked to after the incident.  She said Ms. Roe immediately called her and that M.M. came to Ms. Roe's room to comfort her.

114.    According to M.M., Ms. Roe told her that after kissing Mr. Doe, she was not comfortable with the way things progressed and that Mr. Doe "disregarded what [Ms. Roe] wanted."

115.    M.M. made no mention to Investigators of Ms. Roe's *telling Mr. Doe* at any point that she was uncomfortable or saying no.

116.    According to M.M., following the incident. Ms. Roe no longer wanted to go out and "stopped going to class for a couple weeks."  Both of these things would later be disproven—the former by social media posts showing that Ms. Roe went to two parties in the week that followed, and the latter by the attendance sheet for the class she shared with Mr. Doe, proving that she never missed the class.

117.    S.A. was the next witness interviewed by Investigators.  S.A. was also a friend and sorority sister of Ms. Roe.

118.    S.A. told the Investigators that the afternoon of the incident, she was at a sorority kickball tournament pregame with Ms. Roe.  While pregaming, Ms. Roe told her that she "did what she did (the intercourse) after lunch" and that Mr. Doe "wanted to go to semi-formal with

her." S.A. described Ms. Roe's demeanor when sharing this information as "really excited" and "hopeful."

119.    But two weeks later, Ms. Roe's "attitude about the incident shifted." S.A. told the Investigators that she was walking with Ms. Roe after class and Ms. Roe seemed upset. *Id.* at 28. Ms. Roe said for the first time that she was upset because the sex with Mr. Doe had not been consensual. In response to S.A.'s asking her if she told Mr. Doe "no," Ms. Roe explained that she "did not because if she did resist and he continued then it would be more serious." *Id.* This contradicted what she would later tell both the Investigators and the hearing panel, both of which she told she said "no."

120.    S.A. also told the Investigators that she was concerned that by telling them the truth, she would not be "viewed as supportive." This suggested that S.A. felt that by telling the truth, she would face repercussions socially from Ms. Roe and her sorority. That S.A. was nonetheless willing to risk those repercussions with nothing to gain strongly suggests that she was telling the truth—but the Hearing Panel would nonetheless try to tear down her credibility.

121.    After her interview, S.A. submitted a "Witness Statement Review Response" that reiterated to the Investigators that Ms. Roe told S.A. that she "didn't say no or tell him to stop, for fear of it becoming more serious."

122.    The Investigators next interviewed T.W. regarding Ms. Roe's allegations that he warned Ms. Roe about Mr. Doe.

123.    T.W. was friends with both Mr. Doe and Ms. Roe.

124.    The Investigators asked T.W. about Ms. Roe's statement regarding what T.W. had supposedly told her about Mr. Doe:

> [T.W.] knew I was in a bad mood and he asked me what was wrong. I asked if
> [Mr. Doe] talk[ed] to him about me. I just wanted to know. The gist of what he

said was [Mr. Doe] was the type of guy who talks in a very disgusting way.  His character [is] not reputable about talking about women positively.  [Mr. Doe] described me as a one-time hookup.  [T.W.] told me not to let him treat me like that.

125.    T.W.'s immediate response when the Investigators read him this portion of Ms. Roe's interview was to state that "I don't talk like that."  T.W. further explained that he never warned Mr. Doe about Mr. Doe.  In fact, in T.W.'s opinion, Mr. Doe was a "nice guy" and "a good role model."

126.    Contradicting what Ms. Roe told M.M., T.W. was not even aware that Ms. Roe and Mr. Doe had been sexually intimate at all, much less that Mr. Doe had been bragging to members of their fraternity about it.

127.    The last witness that Investigators interviewed was Ms. Roe's roommate, U.Z.  U.Z. also went to high school with Ms. Roe.

128.    Although Ms. Roe told Investigators that U.Z. was the first person she told about the incident, U.Z. told the Investigators that Ms. Roe did not mention "right away that something bad happened."  Instead, Ms. Roe's concern was limited to the possibility that she and U.Z.'s suitemates "heard [Ms. Roe] having sex."

129.    Not only did Ms. Roe not tell U.Z. that Mr. Doe sexually assaulted her, according to U.Z., Ms. Roe was "upset afterwards that [Mr. Doe] did not mention [taking Ms. Roe to a dance] again."

130.    U.Z. told the Investigators that after Ms. Roe's sexual encounter with Mr. Doe, no changes in Ms. Roe's behavior or demeanor "st[u]ck out in [her] mind."

131.    The first time Ms. Roe told U.Z. that Mr. Doe sexually assaulted her was months later, after they returned home in response to COVID-19.

**E. Other Post-Incident Testimony**

132.    Ms. Roe initially reported her allegations to University of Illinois Police
Department Detective Rob Murphy.  Detective Murphy testified (politely) that although he had
no reason to doubt Ms. Roe's allegations, he believed that Ms. Roe thought having sex with Mr.
Doe would lead to a "long-term relationship" and that "[s]he definitely had an issue with being
ghosted afterward."

**F.  Post-Incident Evidence**

133.    In an effort to verify the date the incident occurred, the Investigators contacted the
instructor for the class Ms. Roe and Mr. Doe took together to verify which classes she missed
following their sexual encounter.

134.    According to the attendance records the Investigators received, contrary to Ms.
Roe's statement that she had missed two consecutive classes following the incident, Ms. Roe had
in fact not missed a single one.

135.    Mr. Doe also provided Investigators with a Snapchat message Ms. Roe sent to
him on March 26, 2020.  It read in part:

> I know this may seem very random, but I need to say this to you for my own
> good.  I had no self confidence nor the capability to stand up for myself in
> response to your actions both during our [hookup] and socially afterwards, but I
> believe now is the time to do so, what happened between us that day was very out
> of the blue, and mentally I do not believe I was prepared to put myself in an
> intimate situation like that.  that decision was completely on me, as I am fully
> aware, however, i did not appreciate your lack of communication with me
> afterwards, especially when you told me you wanted to invite me to delts events
> and asked to come to my semi. After what had happened I clearly was in a state of
> shock, seeing as how you completely used me.

136.    Although the Snapchat message went on to accuse Mr. Doe of sexual assault, the first thing Ms. Roe expressed is how upset she was with Mr. Doe for not pursuing a long-term relationship with her after the two had sex.

## THE HEARING

137.    On July 30, 2020—nearly a year after the alleged incident—the University of Illinois informed Mr. Doe that his hearing had been scheduled for August 13, 2020.  The University made no effort to determine Mr. Doe's availability.

138.    This was poor timing, as Mr. Doe's attorney and advisor, Timothy Grace, was due in court on August 13th.  Mr. Grace promptly reached out to Mr. Gorecki to inform him that he was unavailable and to arrange for a date when Mr. Grace would also be available.

139.    This timely and reasonable request was refused by the University of Illinois.  As a result, Mr. Doe was forced to replace Mr. Grace, a seasoned attorney familiar with the evidence in the case, with his father.  Mr. Doe's father had no legal training, nor was he immersed in the evidence that would be presented to the Hearing Panel.

140.    By arbitrarily setting a hearing date, and then refusing to make a reasonable accommodation, Mr. Doe was not allowed to choose his own advisor.  This limitation, apart from being completely unfair, also violated applicable federal regulations.  *See* CFR § 668.46(k)(2)(iv) (a school may "[n]ot limit the choice of advisor or presence for either the accuser or the accused in any meeting or institutional disciplinary proceeding").

141.    This was the first of many clear signals that the University of Illinois had made up its mind about Mr. Doe's case before the Hearing even began.

142.    The Hearing opened with Mr. Gorecki providing the Panel with an overview of the investigation and its findings.

143.    After Mr. Gorecki's presentation, third-year student panelist J.G. asked Mr.

Gorecki why John Doe was not facing *additional* charges.  Specifically, he asked Mr. Gorecki:

> Yeah. I had one question. So I reviewed the definitions this morning. And so I
> was just struggling with, if you could walk me through why sexual harassment
> was not charged in this case, just because of the many repeated instances where it
> seems that complainant has struggled in the university community since the
> incident. I wasn't sure. If you could just walk me through why that wasn't
> included

144.    **So, fewer than ten minutes into the hearing, one of three panelists who would**

**decide Mr. Doe's fate was asking why Mr. Doe was being charged *only* with sexual assault.**

This clear and obvious demonstration of bias indicated that J.G. had made up his mind without

even hearing from Mr. Doe.

**A. Ms. Roe's Testimony**

145.    Ms. Roe was the first to testify at the Hearing.  Her testimony diverged drastically

from what she had previously told the Investigators and what the evidence showed.  But the

Panel failed to ask Ms. Roe about the contradictions and inconsistencies in her story.

146.    Ms. Roe, in her continuing effort to portray herself as a passive participant in the

sex that she and Mr. Doe engaged in, testified that she had no idea U.Z. would be leaving for

class when she invited Mr. Doe to her room.

147.    In describing the lead up to their sexual encounter, Ms. Roe once again failed to

mention sending U.Z. the following message:

Roe:  when r u coming back

Roe:  [Doe] is tryna

Roe:  lmaoooooooooo

U.Z.:  Lmaooooo class until 3

148.     This text shows that Ms. Roe was an active and enthusiastic participant in her sexual encounter with Mr. Doe and painted a far different picture of their encounter than what Ms. Roe had told the Investigators or the Panel.  **But the Panel did not ask her a single question about it.**

149.     Then, for the first time ever, Ms. Roe admitted that Mr. Doe asked for, and she provided, verbal consent to have sex:  "And then he had asked me if it was okay that we do that. And I basically just said, Yeah, it's fine. And then we began having intercourse at that point." Up until this point, through two interviews, Ms. Roe had maintained that the only consent she provided was non-verbal and that Mr. Doe did not ask for her consent.  In fact, during her first interview, Ms. Roe told the Investigators both that her consent was nonverbal *and* that she in fact did not consent to any of the sexual conduct.

150.     In a case involving only the question of consent, the importance of Ms. Roe's fundamentally changing her story could not have been lost on the Panel.  But in response, only J.G. asked her about it—and even then, he asked only a single question about whether Ms. Roe provided verbal consent to any other actions *besides* sex.

151.     The Panel's willingness to ignore inconsistencies in Ms. Roe's retelling and evidence contradicting her story quickly became a pattern.

152.     Ms. Roe also changed her description of how she told Mr. Doe that she was uncomfortable switching sexual positions.

153.     When Ms. Roe was interviewed by the Investigators, she told them she said no "more than once directly to [Mr. Doe's] face."

154.    But Ms. Roe's forceful "no's" were absent from her Panel testimony.  Instead, Ms. Roe testified that when Mr. Doe asked her to switch positions, she "laughed" to herself, and, "in a light manner," said "no don't do that."

155.    Also absent from her hearing testimony was the "aggravated" and "not happy" reaction Mr. Doe had in the version Ms. Roe told the Investigators.  Instead, Ms. Roe described how she and Mr. Doe simply continued to have sex as they had been doing for several minutes after Ms. Roe declined to switch positions.  The Panel did not ask her a single question about this change in her testimony.

156.    The version of events Ms. Roe told the Panel also did not include Mr. Doe's "forcefully" flipping her over.  Instead, Ms. Roe testified that "it wasn't extremely aggressive." The Panel did not ask her a single question about that change in her story, either.

157.    Ms. Roe told the Panel that after she and Mr. Doe finished having sex, she went to the bathroom to deal with the shock and confusion she was experiencing after the alleged sexual assault.  During this time, Ms. Roe told the Panel she reached out to her roommate, U.Z., but she did not actually specify *what* she told U.Z.

158.    **This is the sum total of what Ms. Roe *actually* texted U.Z.:  "BITCH//I CANT BELIEVE/OUR SUITEMATES HEARD."**

159.    Ms. Roe did not tell U.Z. that Mr. Doe had assaulted her, she did not ask for help, and she did not even say he made her uncomfortable.  Instead, she just worried that they had had sex too loudly.

160.    **Amazingly, the Panel asked Ms. Roe only one question about this text, and to call it a "softball" would be an insult to softballs: "Do you know what you contacted [U.Z.] about and what the conversation was?"**

161.    After Ms. Roe described the text, she told the Panel that there were "more texts after that that [U.Z.] did not disclose."

162.    Incredibly, the Panel did not then ask:

- What these undisclosed messages said;

- Why neither Ms. Roe nor U.Z. had ever previously mentioned them; or

- Why Ms. Roe herself had not disclosed them.

163.    Instead, it just moved on, paying no attention to that man behind the curtain.

164.    Ms. Roe testified that after Mr. Doe left, M.M. and U.Z. "came down and [Ms. Roe] was just telling them what had happened and then we all really realized" Ms. Roe had been sexually assaulted.  Ms. Roe testified further that "they had both stayed there until [Ms. Roe] had to leave around 5 p.m. for" her sorority kickball tournament pregame.

165.    That conversation never happened.

166.    Not only did Ms. Roe fail to mention it to the Investigators, but neither M.M. nor U.Z. said it happened that way. M.M. told the Panel she "left before [U.Z.] got back because I think I went to get food with my roommate."  Likewise, U.Z. testified there "definitely wasn't anyone else in our room" when she briefly returned from class that afternoon before going Halloween shopping.

167.    Yet once again, the Panel did not ask Ms. Roe a single question about this glaring and contradicted change in her testimony.

168.    During her testimony, Ms. Roe also denied telling S.A., at the sorority kickball tournament hours after allegedly being sexually assaulted, that she had sex with Mr. Doe or that he was going to take her to a dance.  **According to Ms. Roe, she "didn't talk to [S.A.] about Mr. Doe or what had happened between us at all."**

169.     **The Panel did not ask Ms. Roe a single question about why her own sorority sister—a reluctant witness who *Ms. Roe herself* had identified as having relevant information—would have lied about or grossly misremembered their conversation.**

170.     Although Ms. Roe had told the Investigators she missed two classes following the incident, she testified to the Panel that she only missed one class (on October 31, 2019).  The reason Ms. Roe changed this part of her story was obvious: she could not have missed two classes between October 25th and November 7th (the date Mr. Doe sat next to her in class), because only a single class was held between those dates.

171.     This change was significant for two reasons.  First, Ms. Roe told the Investigators that she was so distraught following the incident that she missed class for two weeks.  And second, the attendance records gathered by the Investigation showed that Ms. Roe did not miss a single class.

172.     But once again, the Panel did not ask her a single question about this.

173.     The University of Illinois also created a situation where Mr. Doe and his advisor were unable to properly explore these issues themselves.  First, it denied his timely and reasonable request to reschedule the Hearing for a date on which Mr. Doe's advisor could attend.  Second, it provided a system in which all cross-examination was filtered through the Panel— here, a Panel that had already demonstrated its clear bias against Mr. Doe.  That was no cross-examination at all.

**B. Mr. Doe's Testimony**

174.     When Mr. Doe was called to testify, he gave an opening statement that was consistent with exactly what he had told the Investigators all along.  Namely, that he asked for and received consent for everything he and Ms. Roe did together during their sexual encounter.

He also asked the Panel to pay attention to the numerous inconsistencies and contradictions in

Ms. Roe's story—including that she couldn't even remember when it happened.

175.    Student panelist J.G. asked Mr. Doe the first question.  Consistent with his earlier

expressed desire to charge and punish Mr. Doe for more than the University already was, J.G.

asked Mr. Doe if he "could talk a little bit about the potential drinking that may or may not have

happened on that day."  This had nothing to do with what the Hearing was convened to decide.

176.    Investigator Wilczynski —who was not on the Panel and thus not authorized to

ask questions—then asked:

> We went through a line of questioning trying to establish this disparity between
> the 18th and the 19th and you were insistent that it was after the Wisconsin game
> that you returned to Bromley.  Can you talk about why your response that day is
> any different than [Ms. Roe]'s misremembering the 18th?

177.    Mr. Wilczynski did not ask Ms. Roe any questions.

178.    Mr. Doe explained that when he was initially questioned about October 18th, he

knew that the incident could not have happened on that date, but assumed Ms. Roe must have

identified the right weekend, so he told the Investigators the incident likely occurred on October

19th.  Why he misremembered should have been obvious: a fleeting sexual encounter would have

been far less memorable to him than an alleged sexual assault would have been to Ms. Roe (or to

anyone).

179.    **But instead of recognizing the obvious, the Panel chose to grill him about**

***trauma*.**

180.    Panelist Rony Die asked the following questions:

> Dean Die: [Mr. Doe], I just want to follow up on that statement. As you speak
> about trauma, are you well versed in any research or data about how trauma
> affects anyone in any situation? I'm not talking about [Ms. Roe] in particular.

> Mr. Doe: No, sir. I'm not.

Dean Die: Because I just wanted to see. So your statement, I guess, in regards to the complainant's ability to remember or not, is that an opinion or is that based in any kind of research that you have made?

Mr. Doe: That is an opinion that I have. I believe she should remember the date.

181.     These questions were almost comically biased.  As an Assistant Dean, Dean Die knew full well that Mr. Doe, a first-year student with a concentration in business, was not an expert in trauma.  (Is *any* first-year student?  Is Dean Die?)

182.     The purpose of Defendant Die's questions was clear: to undermine Mr. Doe's common-sense argument that, if Mr. Doe had actually assaulted her, Mr. Doe probably would have remembered when it happened.

183.     That these comments came from Dean Die was particularly significant given that, although not technically the Panel's chair, he was clearly the member of the Panel who best understood the hearing procedures and was functionally in control of the proceedings.  In fact, at several points, he had to stop the Panel chair herself and remind her of the proper procedures under the Policy.

**B. Ms. Roe's Witnesses**

       1. Ms. Roe's Roommate, U.Z.

184.     Ms. Roe called three witnesses to testify on her behalf.  Her roommate, U.Z., was the first.

185.     U.Z. told the Panel something she had failed to tell the Investigators: that Ms. Roe knew U.Z. would be leaving for class before she brought Mr. Doe to their room: "she texted me that they would be coming up to our room, like in a couple minutes. And I just said like, "Okay, I'm leaving for class, like in a couple of minutes.""

186.    **This flatly contradicted Ms. Roe's repeated assertions that she did not know U.Z. would be leaving for class and was uncomfortable being left alone with Mr. Doe.** U.Z.'s testimony showed that being alone with Mr. Doe had been Ms. Roe's plan all along.

187.    U.Z. testified that when she returned from class that afternoon, there "definitely wasn't anyone else in our room."  U.Z. then left to go Halloween shopping with other friends.

188.    Again, U.Z.'s testimony showed that Ms. Roe had lied to the Panel.  If U.Z. returned briefly to find Ms. Roe alone, it was not possible that she and M.M. comforted Ms. Roe until Ms. Roe left for her sorority kickball tournament pregame.  Consistent with what she told the Investigators, U.Z. testified that Ms. Roe did not tell her that Mr. Doe sexually assaulted her until some later date.

189.    Yet once again, the Panel completely ignored U.Z.'s hugely significant contradiction of what Ms. Roe had said.

190.    Perhaps the most dramatic revelation from U.Z.'s testimony was that Ms. Roe told U.Z. that she never (contrary to what she had claimed) *told* Mr. Doe he could not have intercourse with her from behind—but instead, that she just didn't *want* to do that.  According to U.Z., Ms. Roe "felt that like Mr. Doe didn't ask her if he could do certain things, but he just like did them and she did not feel comfortable like with what he was doing."

191.    Given the number of contradictions and inconsistencies in Ms. Roe's story that the Panel had already observed, an unbiased Panel would have asked more questions about the story Ms. Roe told her roommate that contradicted the most crucial aspect of her allegation.  But the Panel simply moved on.

### 2. Ms. Roe's Friend and Sorority Sister, S.A.

192.    The next of Ms. Roe's witnesses to testify was her friend and sorority sister, S.A.

193.    As noted above, S.A. had told the Investigators that she talked with Ms. Roe about her sexual encounter with Mr. Doe just hours after it happened, while the two were attending a sorority kickball tournament pregame.  There, Ms. Roe told S.A. that she had sex with Mr. Doe and seemed excited and hopeful about her prospects of a long-term relationship with Mr. Doe.

194.    During her interview with the Investigators, S.A. also said that it was not until weeks later, after Mr. Doe had ghosted Ms. Roe, that her attitude changed and she began to describe her sexual experience negatively.

195.    In response, the Panel chose to go after S.A.

196.    The Panel's questions to S.A. focused almost exclusively on attempting to find evidence that S.A.—Ms. Roe's own sorority sister, a witness Ms. Roe herself had identified, and someone who was so nervous about what she had to say that she asked the Investigators who else would know about it—was biased in favor of Mr. Doe.

197.    Here are the eight questions the Panel asked S.A. seeking evidence that she was biased in favor of Mr. Doe:

Emily Davidson:  Do you have [Mr. Doe's] phone number?
.. .
Emily Davidson:  When did you get your [Mr. Doe's] phone number? .. .

Emily Davidson:  Okay. And can you talk to us about your type of communication that you've had with [Mr. Doe] throughout the year, from the beginning of the year to now?

.. .

Emily Davidson:  Okay. And have you had any communication recently with [Mr. Doe]?

.. .

Emily Davidson: Okay. In this conversation, so far you said that you were just letting him know that you were a witness. You didn't want him to be surprised. Did you guys talk about anything else in this conversation?

.. .

Emily Davidson: Okay. Did you ever share your support for [Mr. Doe's] side of this situation saying that you support him through this situation?

.. .

J.G.: I have a follow-up to that. Do you remember if this conversation happened over phone call or text?

.. .

Dean Die: I'm going to follow up on [inaudible] question, but I do think it's important that we ask very directly. So [S.A.], what we have is a statement from [Mr. Doe] where it says [S.A.] was the other witness who reached out to me. She clearly said that she doesn't believe her, her meaning [Ms. Roe], and supports me, meaning [Mr. Doe]. She said she was in a difficult spot because she didn't want to say anything bad under the concern it might create difficulty due to sorority conflict. Do you recall ever making that statement to [Mr. Doe]?

198.    Faced with a witness who was plainly devastating to Ms. Roe's case, the Panel spent 80% of its questions looking for some reason, *any* reason, to discount her. Before it dismissed her (and having failed to get her to cave on bias), it asked her just two additional, open-ended questions—one about what Ms. Roe told her about consent ("So you were talking about how later in November her attitude about the incident had shifted, but I was a little confused just by the whole ask about the verbal no comments. So could you just explain that to me and what you meant by that?"), and the other about how Ms. Roe's story had shifted ("Could you share with us what was the differences in the two stories?"). It did not follow up on either question.

199.    Despite its best efforts, the Panel was unable to identify any evidence of bias. S.A. testified that she just knew Mr. Doe as a "classmate" and "acquaintance." And as she told

the Investigators, seeming unsupportive of Ms. Roe would lead to problems for S.A. in their

sorority: "I don't know what to do.  If I don't help her, I won't be viewed as supportive.  Who

will see this report?"

200.    S.A.'s testimony to the Panel was also consistent with what she told the

Investigators—that Ms. Roe was excited about the hookup just hours later:  "So in October,

when [Ms. Roe] first told me what happened, we were at a pregame for our sorority and she was

really happy that day.  And then she was like, [S.A.], guess what? And [Ms. Roe's] like, me and

[Mr. Doe] got together.  And [Ms. Roe's] like, I think he wants me to go to semi with him.  And

she was really excited about that."

201.    And as she had also told the Investigators, S.A. testified about how Ms. Roe's

attitude toward Mr. Doe and their sexual encounter soured only later, after Mr. Doe had ghosted

her:

> But then **two weeks later** we were leaving our class, it was a freshmen seminar in
> the college of business.  And we were walking towards our sorority house,
> because it was part of our initiation week.  And [Ms. Roe] seemed really upset on
> the way there.  And I asked her, I was like, What's wrong? And she said that like
> what happened two weeks ago, like she said it wrong to me then.  And what
> actually happened was that it wasn't consensual from her side.  **And I asked [Ms.
> Roe], I said, did you say no to him?  And she said, I didn't say no,** because I
> was scared that if I said no, he continued to do what he was doing.  Then it would
> be more serious than if she didn't say no.

### 3. Ms. Roe's Friend and Sorority Sister, M.M.

202.    Ms. Roe's final witness was M.M., her friend and sorority sister.

203.    M.M. was Ms. Roe's strongest witness—faint praise, given how severely U.Z.

and S.A. had undermined Ms. Roe—but even her testimony contradicted Ms. Roe's in critical

areas and was also inconsistent with the evidence.

204.    First, M.M. told the Panel that although she did come down to comfort Ms. Roe briefly after the incident, she "left before [U.Z.] got back because I think I went to get food with my roommate."

205.    **This is not what Ms. Roe had said.**  Ms. Roe had testified that after her sexual encounter with Mr. Doe, both M.M. and U.Z. came to her room, and Ms. Roe told them what happened.  And then, realizing that Ms. Roe had been sexually assaulted, both M.M. and U.Z. stayed with Ms. Roe until she left to attend her sorority kickball tournament pregame.

206.    But according to M.M.'s testimony, none of this happened.  M.M. and U.Z. did not even cross paths that afternoon.

207.    Furthermore, M.M.'s testimony that she left Ms. Roe alone and went to get lunch *after Ms. Roe told her she was sexually assaulted* raises obvious questions about what Ms. Roe *actually* told M.M. on that afternoon.  (Would M.M. really have left her alone to go eat?)  But the Panel didn't ask any such questions.

208.    The only reasonable inference from M.M.'s decision to leave and get lunch is that Ms. Roe told M.M.—as she also told and texted U.Z.—that she had sex with Mr. Doe but did *not* tell her that she was sexually assaulted.  That would be consistent with M.M.'s leaving Ms. Roe to have lunch, Ms. Roe's attending her sorority kickball tournament pregame, and the positive statements Ms. Roe made to S.A. about Mr. Doe.

209.    Moreover, notably lacking in M.M.'s testimony was any mention of Mr. Doe's asking Ms. Roe for consent to change positions, her refusing to give it, and Mr. Doe proceeding anyway.

210.    The Panel, demonstrating its bias and disinterest in a fair outcome, chose not to ask M.M. any questions about why her testimony contradicted Ms. Roe's or why she decided to go get lunch and leave Ms. Roe alone right after learning she'd been raped.

211.    M.M. also testified that "after it happened, Ms. Roe kind of shut down and didn't want to go out with our friends anymore and would really only see certain people, including myself and her roommate."

212.    But, Mr. Doe, through the Panel, then asked M.M. about a cheery photo showing her and Ms. Roe attending a party just *two days* after the alleged incident. M.M. admitted that Ms. Roe did attend a single party following the incident but said that was, really and truly, the only time: "maybe once out of the probably three weeks prior, I got her to go out with me and my friends.  She did not want to leave her room."

213.    The Panel never asked M.M. why she had exaggerated the alleged impact the incident had on Ms. Roe.  Similarly, they asked no questions regarding M.M.'s previous testimony that Ms. Roe had missed class for two weeks following the incident, given that class attendance records had proven that false.

## THE DECISION

214.    On August 18, 2019, the University issued a decision letter notifying both parties of the outcome of the Hearing (the "Decision").  It found that even though Ms. Roe herself admitted that the intercourse was consensual, she did not consent to switching positions to have sex from behind: "it is more likely than not that the complainant told the respondent she was not comfortable switching over to her stomach."

215.    This conclusion was based on their finding "complainant's testimony to be more credible than the statement provided by the respondent."  *Id*.  In making this credibility

determination, the Decision did not even mention, much less discuss, the multitude of contradictions and inconsistencies in the statements Ms. Roe made to the Investigators and the Panel.

216.    Ignoring these inconsistencies and contradictions alone demonstrates the bias of the Panel, but their stated rationale for believing Ms. Roe's story confirmed it.

217.    The first reason the Panel gave for crediting Ms. Roe's testimony was that Mr. Doe got the date wrong—*even though Ms. Roe herself had gotten it wrong, too*.  The Panel stated that "[i]dentifying the correct date demonstrated that the **complainant's account of what occurred before the incident** was true while the respondent's account was false."  This, of course, makes absolutely no sense.

218.    By taking a mistake that both parties had made—and that Ms. Roe had made *first*—and inexplicably using it to discredit only the male student, the Panel showed clear gender bias.

219.    The second reason the Panel gave for crediting Ms. Roe's testimony was Mr. Doe's acknowledgment that he sat next to her in their shared class two weeks after the incident.

220.    The Panel argued because Mr. Doe testified that he was scared of getting involved with someone who had a history of serious mental health issues, he was not credible because "the respondent's interaction with the complainant on November 7, 2019, did not demonstrate someone scared, terrified, or intending to not speak with someone."  This, of course, makes no sense—there is a difference between being nervous about *dating* someone and deciding to ignore them forever.  Moreover, the Panel completely ignored Mr. Doe's testimony that he was not the type of person who would "completely ignore" Ms. Roe or "completely forget her existence."

221.    The third reason the Panel gave for crediting Ms. Roe's testimony was that she "told U.Z., M.M., and S.A. about the sexual assault."  It is almost hard to comprehend how the Panel could pack so many mistakes into just nine little words.  But it did just that.

222.    The Panel found that Ms. Roe told U.Z. about the assault shortly after the incident, but that contradicted what *U.Z. herself* told both the Investigators and the Panel.

223.    The Panel also cited M.M.'s testimony that Ms. Roe called M.M. and told her that "she was not comfortable with things the respondent did and disregarded what she wanted" as supporting Ms. Roe's false allegations.  But that testimony also contradicted Ms. Roe, who claimed not mere *discomfort*, but that she actually told Mr. Doe no and that he forced her to switch positions anyway.  There is a vast difference between being *uncomfortable* with something you did with your sexual partner and being *sexually assaulted* by him.

224.    Finally, the Panel even cited *S.A.'s* testimony as supporting Ms. Roe's credibility—even though S.A.'s testimony, as explained in detail above, did nothing of the sort.

225.    Indeed, even the Panel itself didn't quite seem to know what to do with S.A. Immediately after citing her testimony as *supporting* Ms. Roe's credibility, *the Panel went on to explain that it did not find S.A. credible*.  It reasoned, bizarrely, that S.A. was the "the only witness" who did not testify to Ms. Roe's providing a "verbal response" to Mr. Doe asking if they could switch positions.  But that made no sense at all.

226.    First, S.A. was not there and could testify only about what Ms. Roe told her—and Ms. Roe *herself* never said she mentioned the "verbal response" to S.A.  Second, what Ms. Roe told S.A., and what S.A. testified to, was that Ms. Roe told S.A. that *she did not tell Mr. Doe* "*no*."  Third, the Panel ignored that M.M.'s account was consistent with S.A., who testified that

Ms. Roe much later told her "that they had sex and that she was extremely uncomfortable and she really didn't want to."

227.    Finally, the Panel entirely failed to mention any of the documentary evidence that contradicted Ms. Roe's account, such as the text messages, the Snapchat, and the class-attendance records.

228.    According to the Panel, Mr. Doe was guilty because Ms. Roe said he was.  It did not matter to the Panel that Ms. Roe's account was undermined by both Ms. Roe's own witnesses and documentary evidence collected during the investigation.

## THE APPEAL

229.    On August 25, 2020, Mr. Doe timely appealed the Panel's Decision.  He challenged the Panel's finding on three grounds:  that the Panel's failure to objectively evaluate the evidence was procedural error; that the Panel was biased against him; and that the sanction he received was disproportionate.

230.    As to the first of these grounds, Mr. Doe began by explaining that the Panel's credibility determination as to him was not objective.  Both Mr. Doe and Ms. Roe originally identified the wrong date for their sexual encounter, but the Panel only held that mistake against Mr. Doe.  An objective panel would also not have found Mr. Doe's sitting next to Ms. Roe two weeks after they had sex to be a sign that he sexually assaulted her—and indeed, would have believed that he was just trying to smooth things over after putting a bit of distance between them.  Mr. Doe proceeded to explain each of the inconsistencies and contradictions that the Panel ignored, and that an objective Panel would not have ignored, in finding him responsible.

231.    Mr. Doe also submitted two photographs of Ms. Roe and M.M. attending parties on October 27, 2019 (two days after the alleged sexual assault) and November 1, 2019 (seven

days after the alleged sexual assault). Both Ms. Roe and M.M. had claimed to the Investigators

and also during the Hearing that Ms. Roe stopped going out after the alleged assault. These

photographs directly contradicted that assertion, including M.M.'s attempt to walk it back at the

hearing by allowing that they did go to *one* party together. One is more than none, and two is

more than one. But the Appeals Panel would ignore this evidence just as the Hearing Panel had

done.

232.    On the second ground, Mr. Doe argued that the Panel's conduct during the

hearing demonstrated bias. In support of this ground, Mr. Doe explained how J.G. and Dean Die

exhibited bias towards him during the Hearing, as noted above. Further, Mr. Doe called

attention to the fact that the Panel spent 80 percent of its time questioning S.A. fishing for

evidence that she was biased in favor of Mr. Doe. Finally, Mr. Doe argued that the Panel

showed bias by breaking with University procedure and allowing the University's investigator to

question him during the hearing.

233.    The third ground Mr. Doe challenged was the severity of the sanction. Given the

conflicting evidence, Mr. Doe's admission that she consented to the sexual activity overall (just

not one position during it), and Mr. Doe's unblemished record, dismissal from the University for

two years was not warranted.

234.    Although she was permitted to, Ms. Roe did not submit a response to Mr. Doe's

appeal.

235.    Mr. Doe's appeal was denied by the University of Illinois on September 11, 2020.

Consistent with its biased approach to Mr. Doe's case, the University dedicated less than a page

to its rejection of Mr. Doe's 22-page appeal. Not surprisingly, given its length, the rejection did

not even bother to engage with Mr. Doe's arguments or explain its reasoning for rejecting Mr. Doe's appeal.

236.    Here is the entirety of the Appeals Panel's treatment of Mr. Doe's credibility argument: "Although the appellant has challenged the credibility determinations they made, the appeal committee concluded that the panel had reasonable grounds for those determinations and found no reason to conclude that the panel demonstrated bias (on the basis of gender or any other basis) or a lack of objectivity."

237.    With respect to Mr. Doe's contention that it constituted procedural error to allow Investigator Wilczynski to ask questions, the Appeals Panel stated that "the procedures at the time did not forbid the investigator from asking questions during the hearing."  That is clever wording that avoids the actual issue: The Policy specifically identifies who *is* permitted to participate in questioning.  Investigators are not listed.  Therefore, they cannot participate.  Saying he *could* because the Policy didn't say he *couldn't* turns the logic of the Policy upside-down.

238.    Finally, with respect to Mr. Doe's contention that the sanction was excessive, the Appeals Panel stated only as follows: "Lastly, the sanctions imposed by the original panel are consistent with the Senate Committee on Student Discipline's sanctioning guidance, so the appeal committee found no reason to modify them."

239.    In sum, the Appeals Panel only bothered to explain its rejection of *one aspect of one* of Mr. Doe's three arguments—and it got that one wrong.

**CAUSES OF ACTION**

**COUNT I – VIOLATION OF TITLE IX (20 U.S.C. § 1681)**
**(Against Defendant Board of Trustees)**

240.    Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

241.    The University of Illinois receives federal funding, including in the form of federal student loans given to students.  Because it receives federal funding, the University of Illinois is subject to the requirements of Title IX.

242.    Title IX prohibits sex discrimination in the educational setting.  The egregiously biased manner in which the University of Illinois conducted the Hearing, rendered its Decision, and denied Mr. Doe's appeal cast serious doubt on the University of Illinois's finding of responsibility, and show that the decision against Mr. Doe was based on his sex and the sex of his accuser.

243.    As detailed above, Defendants finding that Mr. Doe was responsible for non-consensual sexual contact with Ms. Roe was erroneous and based on facts that more than establish an articulable doubt regarding the accuracy of the University of Illinois's expulsion of Mr. Doe.

244.    Also detailed above, there is a particularized causal connection between Mr. Doe's erroneous discipline and his sex.

245.    The University of Illinois initiated its investigation and adjudication of the allegations against Mr. Doe in the shadow of (1) news reports detailing the inadequate response the University has had to allegations of sexual misconduct by its administrators and faculty and (2) innumerable reports covered in the national media suggesting that sexual assault committed

by male students against female students on college campuses is a veritable epidemic. As a reaction to the scrutiny of these national stories, and in particular in response to its own recent negative coverage, the University of Illinois was motivated to be perceived as aggressively addressing women's claims of sexual assault on its campus. It has therefore treated male students accused of sexual misconduct by female students, including Mr. Doe, more aggressively than it otherwise would, and more aggressively than it would treat similar complaints made by male students against female students.

246.    The effects of gender bias were manifested in the proceedings against Mr. Doe. For example, during the Hearing, one of the panelists questioned why Mr. Doe was not being charged with *even more* misconduct. That panelist did not question why the allegations of Ms. Roe were sufficient to require a hearing, or ask Ms. Roe or any of her witnesses a single question that could reasonably be read to express skepticism of her allegations. Throughout the Hearing, the Panel behaved in ways that betrayed its bias, including by allowing an investigator to question Mr. Doe, even though the rules did not permit him to.

247.    The bias of the Panel was most clearly demonstrated in its Decision. Most obviously, the Panel determined that a mistake *both Mr. Doe and Ms. Roe made*, and that *Ms. Roe made first*, weighed in favor of Ms. Roe's credibility and against Mr. Doe's.

248.    The University of Illinois has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students. Upon information and belief, the University of Illinois has not acted comparably with respect to allegations of sexual misconduct made against female students.

249.    As a direct result of the University of Illinois's violation of Title IX, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the

following ways, among others: he has endured extreme emotional and psychological suffering as a result of the College's one-sided treatment of the false sexual assault charges against him; he lost the ability to obtain college credit from the University of Illinois for at least a period of two years; his attainment of a college degree, if any, will be delayed, thereby delaying the time at which he can begin a career and shortening the length of that career; his academic records from the University of Illinois will reflect his dismissal, handicapping his ability to be accepted at a transfer school or graduate school or to secure his desired employment; and he will suffer a permanent reduction in lifetime earnings.

250.　　Accordingly, Defendant the Board is liable to Mr. Doe for violations of Title IX and for all damages arising out of that violation. Further, the Board must (i) reinstate Mr. Doe as a student, (ii) enter a finding of non-responsible (or, if not that, provide Mr. Doe with a new disciplinary proceeding free from the bias and constitutional violations addressed in this complaint), and (iii) vacate and expunge Mr. Doe's official and unofficial University of Illinois files of all information related to his interactions with Ms. Roe.

**COUNT II – VIOLATION OF PLAINTIFF'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS (42 U.S.C. § 1983)**
**(Against Individual Defendants In Their Official Capacities Only For Injunctive Relief)**

251.　　Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

252.　　Mr. Doe's constitutionally protected liberty and property interests were violated by Individual Defendants' actions detailed in the Complaint.

253.　　Mr. Doe's property interest arises from the policies and procedures of the University upon which he relied on in enrolling at the University of Illinois, and as a result of the consideration he paid, in the form of tuition, to ensure his continued enrollment at the University.

48

254.    The Code guarantees Mr. Doe the same rights as any other citizen of the United

States.  It provides that:

> A student at the University of Illinois at the Urbana-Champaign
> campus is a member of a University community of which all
> members have at least the rights and responsibilities common to all
> citizens, free from institutional censorship; affiliation with the
> University as a student does not diminish the rights or
> responsibilities held by a student or any other community member
> as a citizen of larger communities of the state, the nation, and the
> world.

255.    Similarly, The Policy guarantees that "[a]ll disciplinary decisions will be made on

an objective evaluation of the evidence" and "[n]o disciplinary decisions, including credibility

determinations, will be based on a person's status as a complainant, respondent, or witness or on

a person's membership in a protected class."

256.    These promises provided Mr. Doe the right not to be disciplined absent good

cause.  *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019).

257.    Separately, Mr. Doe had a constitutionally protected liberty interest in his good

reputation, his continued enrollment at the University of Illinois, and his right to complete his

undergraduate degree at the University of Illinois.  That interest was violated by Individual

Defendants' actions detailed in this Complaint.

258.    As a result of the University's finding and Mr. Doe's dismissal, he suffered

reputational damage and an alteration of legal status.  In particular, the discipline imposed by the

University of Illinois permanently damaged Mr. Doe's due process liberty interest in the career

prospects of his chosen profession, denied him the benefits of education at his chosen school,

and damaged Mr. Doe's reputation.  This is partly because Mr. Doe is currently seeking to work

in the field of finance.

259.     Mr. Doe's chosen field of employment triggers legal obligations to disclose—often under penalty of perjury—the University of Illinois's discipline of Mr. Doe to graduate schools from which Mr. Doe might seek an MBA and federal and state entities providing licenses to work in the financial services industry.

260.     It would be virtually impossible for Mr. Doe to obtain the educational or licensing credentials to work in financial services without encountering a legal obligation to disclose the University of Illinois's discipline.  This is because applications to graduate schools and licensing boards contain a legal obligation to disclose disciplinary actions such as the University of Illinois's discipline of Mr. Doe.

261.     Because the University's dismissal of Mr. Doe implicated both his constitutionally protected liberty and property interests, it was subject to the Constitution's due process protections.

262.     It is well established that the Fourteenth Amendment's due process protections apply to higher education proceedings.

263.     Mr. Doe obeyed all of the University's rules.  Nevertheless, the University of Illinois unlawfully dismissed him for a period of two years.

264.     The University of Illinois, as a land grant university established by the State of Illinois, and the Individual Defendants, as agents of the University of Illinois, has a duty to provide University of Illinois students equal protection and due process of law by and through any and all policies and procedures set forth by the University of Illinois.

265.     As detailed in the Complaint, Mr. Doe was not provided due process under the law.

266.    Mr. Doe was entitled to a meaningful opportunity to be heard and a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing.  Doe was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.  And under the Due Process Clause, the University was required to give Doe a "real" hearing, "not a sham or a pretense." *See Doe v. Purdue Univ.*, 928 F.3d 663 (7th Cir. 2019).

267.    In the course of such investigation and adjudication, the Individual Defendants, acting as agents of the University of Illinois, flagrantly violated Mr. Doe's clearly established rights under the Due Process Clause of the Fourteenth Amendment through deprivation of the minimal requirements of procedural fairness in numerous respects, including, without limitation, denying Mr. Doe an opportunity to cross-examine Ms. Roe and witnesses at the Hearing.

268.    Numerous courts have held that due process requires schools to provide some form of meaningful cross-examination in the adjudication of sexual misconduct allegations at public schools.  *See e.g. Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018) (university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder); *Powell v. Montana State Univ.*, No. 2:17-cv-15 SEH, Docket 134, p. 21 (D. MT Dec. 21, 2018) (citing lack of cross examination as basis for rejecting university's summary judgment motion to dismiss a procedural due process claim because "[i]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process"); *Messeri v. Distefano*, 2020 U.S. Dist. LEXIS 150942, *14 (D. Colo. August 20, 2020) (citing lack of cross-examination for rejecting university's summary judgment motion to dismiss a procedural due process claim because, "[t]his is a classic 'he said, she said' case that turns almost

entirely on witness credibility.  Without live adversarial questioning, Plaintiff cannot probe the witnesses' stories to test their memories or potential ulterior motives, or to observe the witnesses' demeanor"); *Doe v. Univ. of Cinn.*, No.16-4693, 2017 WL 4228791, *5 (6th Cir. Sept. 25, 2017) (discussing need for cross-examination in Title IX disciplinary proceedings); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) (same).

269.    Since there were no eyewitnesses who observed any of Mr. Doe and Ms. Roe's sexual interactions on October 25, 2019, and no conclusive documentary or physical proof was identified, Ms. Roe's allegations against Mr. Doe came down to a credibility assessment.

270.    The University of Illinois did not provide Mr. Doe with the opportunity to cross-examine Ms. Roe as required under the Constitution.  Instead, the University of Illinois provided that Mr. Doe could submit questions to a biased Panel that had the authority under the Policy to reformulate or disregard them at will.  This was not sufficient to replace Mr. Doe's constitutionally protected right to cross-examine Ms. Roe and her witnesses.

271.    Further, when the University denied Mr. Doe the right to have his chosen advisor present for the Hearing, it denied him the ability to effectively cross-examine Ms. Roe and the other witnesses.  To force Mr. Doe and his non-lawyer father, on short notice no less, to familiarize themselves with cross-examination is patently unfair.  As one court explained, it is "unfair when students are strangers to [a formal adjudicatory] process and rely entirely on what is told to them to inform their understanding of what they are up against.  A reasonable juror could decide that it is not 'fair' to require a student who knows little or nothing to figure out what s/he does not know in order to ask productive questions."  *Doe v. Johnson & Wales Univ.*, 425 F. Supp. 3d 108, 114 (D.R.I. November 26, 2019).

272.    Accordingly, by finding Mr. Doe guilty without affording him a genuine opportunity to cross-examine Ms. Roe or other witnesses, the University of Illinois violated Mr. Doe's clearly established constitutional right to due process.

273.    Mr. Doe was also denied the opportunity to be meaningfully heard because the Panel that adjudicated his Hearing, and, on information and belief, the Appeal adjudicators, had decided to find him guilty before the Hearing was held and before his notice of appeal was filed, respectively.

274.    By engaging in the conduct detailed in the Complaint, Individual Defendants deprived Mr. Doe of his property and liberty interests without affording him basic due process, including, but not limited to:  (i) his right to fair adjudication, free of bias; (ii) his right to be innocent until shown to be responsible; (iii) his right to question Ms. Roe and other witnesses; and (iv) his right to present evidence and witnesses in support of his defense.

275.    Individual Defendants, as well as other agents, representatives, and employees of the University of Illinois, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Mr. Doe's constitutional rights.

276.    Individual Defendants agreed to, approved, and ratified this unconstitutional conduct as described above.

277.    Accordingly, the Individual Defendants are liable to Mr. Doe in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising from them.

278.    Based on the facts detailed above, Mr. Doe is entitled to a declaration that the University of Illinois's policies, as applied to Mr. Doe, violate the Due Process Clause of the United States Constitution such that Individual Defendants must (i) reinstate Mr. Doe as a

2:20-cv-02265-CSB-EIL  # 1  Page 54 of 55

student, (ii) enter a finding of non-responsible (or, if not that, provide Mr. Doe with a new disciplinary proceeding free from the bias and constitutional violations addressed in this complaint), and (iii) vacate and expunge Mr. Doe's official and unofficial University of Illinois files of all information related to his interactions with Ms. Roe.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against Defendants, and order relief against Defendant as follows:

a.  That this Court issue a temporary restraining order and preliminary and permanent injunctive relief, ordering the University of Illinois to (1) reinstate Mr. Doe as a student at the University of Illinois with any and all scholarships previously awarded and provide Mr. Doe a new disciplinary proceeding free from the infirmities addressed in this Complaint; (2) refrain from reflecting, in any manner whatsoever, in Mr. Doe's records or elsewhere, the findings or sanctions imposed upon John Doe based on its adjudication of Ms. Roe's complaint; and (3) refrain from maintaining any records related to that sanction, as it was the product of the University's erroneous finding that he violated the Policy, which was itself the product of a flawed disciplinary process; and

b.  That the Board be ordered to pay compensatory damages as appropriate to compensate John Doe for his losses caused by the University's misconduct; and

c.  That the Board be ordered to pay punitive damages; and

d.  That this Court award John Doe his attorneys' fees, costs, and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:  September  25, 2020

/s/ Norman Anderson
Norman Anderson
Justin Dillon (application forthcoming)
Scott Bernstein (application forthcoming)
KAISERDILLON PLLC
1099 14th Street NW
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
nanderson@kaiserdillon.com
jdillon@kaiserdillon.com
sbernstein@kaiserdillon.com

*Attorneys for Plaintiff John Doe*