IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>              Plaintiff,<br><br>     v.<br><br>UNIVERSITY OF ILLINOIS BOARD OF TRUSTEES, GENE E. ROBINSON, *Interim Dean of College of Liberal Arts & Sciences, sued in his official capacity*, and JUSTIN BROWN, *Associate Dean of Students, sued in his official capacity*,<br><br>              Defendants. | Civil Action No. 20-CV-02265<br><br>Honorable Colin S. Bruce<br>Magistrate Eric I. Long |

**REPLY BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER**

If you don't have the facts, pound the law. If you don't have the law, pound the facts. And if you don't have either, pound the table. Defendants' response to Mr. Doe's motion is an exercise in table-pounding. They know that they don't have the facts, because the facts show that Mr. Doe is innocent. They also know they don't have the law, because Mr. Doe's clear innocence and the unmistakable presence of bias in his hearing more than show that he has "some likelihood" of success on the merits. So they pound the table—here, this Court's opinion in *Doe v. Board of Trustees of the University of Illinois*, No. 15-17-cv-02180. (C.D. Ill. Oct. 9, 2017) (the "2017 Case"). They hope this Court will hold, as it did there, that an education gap does not constitute irreparable harm and thus deny Mr. Doe's request for an injunction almost out of hand. It is a good strategy, and it is what Mr. Doe would do if he were in their position.

But this Court should not fall for it.  To be sure, Mr. Doe is well aware of this Court's prior holding.  But as he hopes he showed in his initial filing and will show again in this reply brief, his case is different.  Here, unlike in the 2017 Case, the evidence of actual innocence is overwhelming.  Here, unlike in the 2017 Case, there is an expert declaration outlining precisely why an education gap is an irreparable harm.  And here, unlike in the 2017 case, it is procedurally easier to grant Mr. Doe what he is requesting—a return to "Zoom school" that, contrary to Defendants' curious claim, *is* actually within a federal court's power to order.

This Court's prior decision is not binding on it.  The facts of Mr. Doe's case are much different than the facts of the 2017 Case, and even the law has changed since then.  But most striking is the record before the Court in this case compared to the 2017 Case.  There, this Court was asked to grant injunctive relief without any supporting evidence; here, by contrast, Mr. Doe has filed both his own declaration and that of an expert in the field attesting to the irreparable harm that will result if the Court denies his motion.  Mr. Doe thus respectfully asks this Court to grant his motion and allow him to return to school while this case moves forward.  He also believes that a hearing would assist the Court in resolving his motion and respectfully asks this Court to schedule one at its earliest convenience.

> I. **Without Injunctive Relief, Mr. Doe Will Suffer Irreparable Harm From the Resulting Education Gap.**

According to Defendants, this Court need look no further than its order denying injunctive relief in the 2017 Case when deciding this motion.  But they elide the significant differences between the instant case and the 2017 Case.  As a preliminary matter, the 2017 Case involved allegations of sexual assault that were substantiated by eyewitnesses, text messages sent by the plaintiff, *and* inculpatory statements made by the plaintiff to a friend.  *See Doe v. Board of Trustees of the University of Illinois*, No. 33-cv-02180. (C.D. Ill. Oct. 9, 2017).  No such

evidence of guilt exists here. Instead, the only evidence against Mr. Doe was Jane Roe's testimony and the testimony of Ms. Roe's friends regarding what she told them. Mr. Doe made no admissions, because he didn't do anything wrong. Moreover, literally all of the documentary evidence and a female witness called by Ms. Roe herself supported Mr. Doe's version of events that this was a consensual encounter Ms. Roe soured on only after he ghosted her. ECF No. 5-2 at 13-14. For her part, Ms. Roe has told a variety of differing accounts about her encounter with Mr. Doe—ranging from a violent assault,[1] to being primarily concerned that her suitemates heard she and Mr. Doe's sexual encounter,[2] to being excited and happy about her encounter with Mr. Doe and changing her story after Mr. Doe failed to subsequently ask her out.[3] Simply put, unlike the 2017 Case, this case involves Defendants violating Title IX and the Due Process Clause of the Constitution by improperly finding a provably innocent student responsible for sexual misconduct.

In addition to ignoring conflicting testimony and other evidence pointing to Mr. Doe's innocence, multiple members of the hearing panel revealed their bias against Mr. Doe during the hearing. For example:

- One of the hearing panel members stated that he believed Ms. Roe had "struggled in the university community since the incident" at the onset of the hearing and asked why Mr. Doe was not facing additional charges. ECF No. 5-2 at 10.

- When Ms. Roe's friend S.A. testified that Ms. Roe changed her story about what happened only *after* Mr. Doe ghosted her, the hearing panel spent 80 percent of its questions for S.A. trying to prove that she was biased in favor of Mr. Doe. *Id*.

---

[1] "Suddenly, Mr. [Doe] forced her onto her stomach and put his hand on her back to keep her from turning over. While holding her down, Mr. [Doe] reportedly inserted his penis into her vagina and continued to have intercourse." ECF No. 18 at 81.

[2] "I don't think she mentioned right away that something bad happened. She was somewhat embarrassed because she thought our suite mates heard what happened." ECF No. 18 at 121.

[3] "They hooked up in late October, she told me and was excited on that day, but two weeks later when it came up again in early November she was upset." ECF No. 18 at 127 n.6.

- One of the hearing panel members unnecessarily challenged a common-sense assertion made by Mr. Doe—that Ms. Roe would probably remember the date of the incident if it actually *had* been an assault—because Mr. Doe, a college sophomore, was not an expert in trauma.[4]  *Id*.

In short, Mr. Doe was found responsible after the hearing panel ignored evidence proving his innocence and betrayed its bias during the course of the hearing, all of which happened against a backdrop of intense pressure on Defendants as a result of their inadequate response to previous allegations of sexual assault.  ECF No. 5-2 at 9-12.

Here, there is ample reason for the Court to consider the issue anew and find that the gap would irreparably harm Mr. Doe.  Metaphysical certainty is not required; judges are not shamans being asked to predict the future.  "For preliminary relief to be granted, the irreparable harm must []be likely.  That is, there must be more than a mere possibility that the harm will come to pass, but the alleged harm need not be occurring or be certain to occur before a court may grant relief."  *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788–89 (7th Cir. 2011).  The Court need find only that the harm from Mr. Doe's impending education gap would be *likely*; here, it is much more than likely, as the attached Declaration from educational consultant Hanna Stotland makes clear.  Regardless of whether he is eventually vindicated at trial, the education gap will not only remain, but will grow ever larger as this case grinds on.  Stotland Dec. ¶10.  An education *gap*, unlike an education *delay*—a clever attempt at conflation by Defendants—can also not be ameliorated by transferring to a different school.  *Id*. at ¶14.  That is because both a gap and a transfer will raise questions Mr. Doe will have to answer—and the answer will

---

[4] Defendants argue that this was not indicative of bias because Mr. Doe's assertion was not consistent with the "'trauma-informed response' concepts and training that Illinois law requires Hearing Panel members to take."  ECF No. 16-1 at 27.  They miss the point.  Mr. Die's tendentious question betrayed his bias not only because Mr. Doe was *right*, but also because the most senior member of the hearing panel—rather than use his "training" to weigh Mr. Doe's argument as he saw fit—instead asked a series of questions intended to embarrass Mr. Doe.

inevitably hurt him. *Id*. Defendants state that there are "all sorts of reasons" why a student might have an education gap, and that is true. But what matters is not whether there is *some* reason, but *what that reason actually is*. If Mr. Doe had a gap because he got sick, because he had financial issues, or just because he didn't want to go to Zoom college for a year, that would be easy to explain. But that isn't his reason. *His* reason is that Defendants say he sexually assaulted someone. If Mr. Doe were asked in an application or an interview for school or employment—which he almost certainly would be—why he had a gap or had transferred, he would be forced to either reveal that terrible reason or lie.[5]

This harm is not "uncertain or speculative, but [will] occur absent intervention by the Court." *Flynn v. Doyle*, 672 F. Supp. 2d 858, 880 (E.D. Wis. 2009) (internal quotation marks omitted). The disclosure of this information would surely make Mr. Doe less likely to be admitted to a graduate program or receive a job offer. *Id*. at ¶¶10-14. This is particularly true given Mr. Doe's stellar academic performance, as the elite schools and coveted positions to which he would apply would be looking for reasons to reject candidates rather than accept them.[6] If the Court declines to act, Mr. Doe will acquire an education gap and the irreparable harm that inevitably comes with it.

## II.     Defendants Wrongly Conflate Education *Delay* with Education *Gap*.

Defendants conflate the separate harms of education delay and education gap. This is a fundamental misreading of the case law and Mr. Doe's arguments. An education *delay* occurs when a student fails to graduate at the same time as other students in his class and will be

---

[5] Even if Mr. Doe were to lie about the gap with a "reason[] related to the global coronavirus pandemic," ECF No. 16-1 at 19, he would always run the risk of losing whatever he gained by that lie if he were found out.

[6] For this reason, vindication at trial would not address the harm caused by the education gap. Most people who hear the phrase "falsely accused rapist" tend not to hear the first two words.

delayed in joining the workforce. An education *gap* is different: it is the dog that did not bark, creating an "inevitab[ility] that [the student] w[ill] be asked to explain the situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct." *King v. DePauw University*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014). Defendants' failure to appreciate this distinction led them to rely almost entirely on *delay* cases, rather than *gap* cases.[7]

In fact, the only "gap" case Defendants cite is *Doe v. Vassar Coll.*, No. 19-CV-9601 (NSR), 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019), which is readily distinguishable from the instant case. There, the court rejected the plaintiff's education gap arguments as "too speculative to warrant injunctive relief, since he has *identified no plans to attend any graduate school or pursue any specific career besides professional soccer*, and Plaintiff does not claim that his potential employers in that area have any interest in his completion of a college degree, let alone his suspension for one semester." *Id*. (emphasis added.) Mr. Doe does not want to be a professional athlete; he is pursuing a career in finance and hopes to earn an M.B.A. Unlike the plaintiff in *Vassar*, he has definitive plans that would be derailed if he were to be saddled with an education gap. There is no doubt that an education gap, and the reasons for it, would be of interest to the gatekeepers of the elite programs and institutions Mr. Doe hopes to join.

---

[7] *Hodges v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 2020 WL 5017665, at **3-4 (E.D. La. Aug. 25, 2020) (did not address whether an education gap constituted irreparable harm); *Doe v. Princeton Univ.*, 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) (same); *Madej v. Yale Univ.*, 2020 WL 1614230, at *6–7 (D. Conn. Mar. 31, 2020) (same); *Roden v. Floyd*, 2018 WL 6816162, at *5 (E.D. Mich. Nov. 13, 2018) (same); *Nimer v. Case Western Reserve Univ.*, 2018 WL 5118306, at **5-6 (N.D. Ohio Oct. 22, 2018) (same); *Medlock v. Trustees of Indiana Univ.*, No. 1:11-CV-00977-TWP, 2011 WL 4068453, at *9 (S.D. Ind. Sept. 13, 2011) (same); *Ben-Yonatan v. Concordia Coll.*, 863 F. Supp. 983, 986 (D. Minn. 1994) (same).

Defendants—tellingly—bury in a footnote their attempt to distinguish the many cases finding that an educational gap constitutes irreparable harm because the "facts of those cases were distinct" from the instant one. ECF No. 16-1 at 16n.10. But the only distinction they draw is when in the semester the student was disciplined. While such a distinction may be relevant to a balancing of the equities, it has no bearing on the irreparable harm Mr. Doe would suffer as a result of the "questions the gap raises, and the explanation it requires." *Doe v. Univ. of Notre Dame*, No. 3:17CV298-PPS/MGG, 2017 WL 1836939, at *12 (N.D. Ind. May 8, 2017), *vacated on other grounds*, No. 3:17CV298-PPS/MGG, 2017 WL 7661416 (N.D. Ind. Dec. 27, 2017) (finding that an education gap constitutes irreparable harm); *see also King v. DePauw University*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) ("The Court finds it inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw."); *Doe v. Pennsylvania State Univ.*, 276 F. Supp. 3d 300, 315 (M.D. Pa. 2017) ("Specifically, even if Doe's suspension from the Penn State–Thomas Jefferson program were limited to two years (as adduced by Penn State), I nevertheless conclude that this gap would constitute irreparable harm as he would forever be forced to explain his lengthy tenure within this program and, ultimately, his delayed entry into the professional workforce."); *Doe v. Univ. of Connecticut,* No. 3:20CV92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020) ("If he is not permitted to enroll in the Spring 2020 semester, he would need to explain a gap on his résumé in future applications to schools or jobs. He would also need to explain the suspension notation on his UCONN transcript, and a truthful explanation would seriously hinder his prospects."); *Doe v. Middlebury College*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) ("Plaintiff would have to explain, for the remainder of his

7

professional life, why his education either ceased prior to completion or contains a gap."); *Jones v. The Board of Governors of the University of North Carolina*, 704 F.2d 713, 716 (4th Cir. 1983) ("[W]ithout a preliminary injunction Jones will obviously suffer irreparable injury: she will be barred from taking courses during the spring semester, delaying the time at which her ability to work as a nurse will come to fruition; she will have a gap in her education which she will be forced to explain throughout her professional life"). In sum, as court after court has recognized and Ms. Stotland's Declaration also shows, the harm of an education gap is inevitable and irreparable.

### III. The Court Has the Authority to Prevent John Doe from Having Any Education Gap.

Defendants argue that the Court lacks the power to order relief that would spare Mr. Doe from having an education gap. ECF No. 16-1 at 16 ("Plaintiff cannot at this point re-enroll in classes for the Fall 2020 semester."). We disagree. Mr. Doe is confident that the Court could craft relief that would allow him to escape the lifetime burden of an education gap. As a preliminary matter, Mr. Doe has not yet missed the entire semester. Although six weeks have passed since Mr. Doe was dismissed on August 24, 2020, ECF No. 16-1 at 16, Mr. Doe attended classes until September 10, 2020. He has missed a little over a month. More importantly, he was assigned to, and participated in, groups in the relevant classes. He undoubtedly would be able to be able to rejoin those groups and participate as a member of them for the remainder of the semester.[8] To the extent that Mr. Doe has missed some graded activities, be they group presentations or projects that cannot be made up, surely he can be assigned other work to supplement his grades or have his grades limited to the activities that he was able to participate

---

[8] To the extent that it would be helpful to the Court, Mr. Doe would be happy to submit a declaration regarding the coursework he has completed thus far.

in.  Although Defendants describe Mr. Doe's rejoining the school after a month away as a herculean and "unprecedented" endeavor, Mr. Doe is confident that similar accommodations have been made where students have been forced to miss portions of a semester for other reasons, such as recovery from illness.  He is in undergraduate business school, not medical school; it is not as if he missed a month of cadavers and is now asking to do surgery.  In any case, even if the group presentations are so critical that Mr. Doe could not rejoin the exact courses he was previously enrolled in, he certainly could be enrolled in alternative courses allowing Mr. Doe to finish the semester without an education gap.

Defendants' argument is also fundamentally unfair.  The timing of Mr. Doe's dismissal was completely in Defendants' hands.  Even though this event was reported on March 26, 2020, it took Defendants five months to render a decision.  Two weeks after Mr. Doe's appeal was denied,[9] he filed the instant motion with this Court.  (If he had filed it *before* his appeal was decided, as Defendants seem to suggest he should have done, ECF No. 16-2 at 1-2, they would have inevitably claimed it was not ripe and that he first needed to exhaust his school remedies.  The "heads I win, tails you lose" character of their argument is hard to miss.)  Mr. Doe did not delay in seeking relief.  In fact, it was *Defendants* who sought to delay resolution of this motion by asking for an extension—originally for *three additional weeks*—to file their response to the instant motion, most of which simply repeats arguments they made to this Court in the 2017 Case.  ECF No. 13.  It strains credulity for Defendants to first delay resolution of its own administrative process, then delay resolution by this Court, and finally claim that relief is unavailable to Mr. Doe because not enough time remains in the semester.

---

[9] Contrary to footnote 12 in Defendants' Opposition brief, Mr. Doe *does* allege bias on the part of the appeal panel.  ECF No. 1 at ¶¶229-39.

9

### IV.      A Hearing Would Assist the Court in Resolving the Motion.

Mr. Doe respectfully suggests that a hearing would assist the Court in deciding his motion.  Among other things, it would allow the Court to probe more deeply into what remedies Defendants would be able to implement.  Mr. Doe would prefer to rejoin the classes in which he was previously enrolled, but if this were impossible, he would be open to other solutions that would not create a gap.  Mr. Doe would also be open to the relief of being granted a new hearing (as long as he could reenroll during its pendency), as he is confident that he would prevail if granted a fair hearing.  *See Doe v. Bd. of Trs. of Univ. of Illinois*, No. 19-cv-2054, slip op. at 6 (C.D. Ill. Apr. 1, 2019) (noting that "[i]f Plaintiff were to have asked this court for injunctive relief in the form of a new hearing, the court may have been inclined to grant such a request.").

Moreover, given the complicated factual history and numerous conflicting statements at issue in this case, a hearing would allow the parties the opportunity to answer the Court's questions regarding disputed interpretations of the underlying facts.  For example, Defendants claim that Mr. Doe's credibility was called into question when S.A. "flatly denied" telling him that she supported him.  ECF No. 16-1 at 27.  But that isn't what happened: S.A. told Mr. Doe that she intended to tell the hearing panel the truth, namely, that Ms. Roe was initially happy about her encounter with Mr. Doe but later changed her story.  ECF No. 18 at 176.  It not hard to see how a college sophomore would interpret this as "supporting" him.  This is precisely the sort of factual distinction that can be explored and clarified during a live hearing.

### Conclusion

For the foregoing reasons, John Doe respectfully requests that his Motion for a Temporary Restraining Order and Preliminary Injunction be granted.  To the extent that the

10

Court does not see fit to grant this relief based solely on the parties' briefing, Mr. Doe asks that the Court hold a hearing to address the issues raised by his Motion for a Temporary Restraining Order and Preliminary Injunction.

                                                 Respectfully submitted,

DATED: October 16, 2020                       By: /s/ Justin Dillon

                                              KAISERDILLON PLLC
Justin Dillon
Norman Anderson
Scott Bernstein (application forthcoming)
1099 14th Street NW, 8th Floor West
Washington, District of Columbia 20005
Telephone: (202) 640-2850
Facsimile: (202) 280-1034
jdillon@kaiserdillon.com
nanderson@kaiserdillon.com
sbernstein@kaiserdillon.com

*Attorneys for Plaintiff John Doe*