E-FILED
Friday, 13 November, 2020  06:18:43 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>        v.<br><br>UNIVERSITY OF ILLINOIS BOARD OF TRUSTEES, GENE E. ROBINSON, Interim Dean of College of Liberal Arts & Sciences, sued in his official capacity, STEPHEN BRYAN, Associate Vice Chancellor and Dean of Student and Advocacy and Support, sued in his official capacity, and JUSTIN BROWN, Associate Dean of Students, sued in his official capacity.<br><br>                    Defendants. | Civil Action No. 20-CV-02265 |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS JOHN
<u>DOE'S COMPLAINT</u>**

**Introduction**

Defendants' motion to dismiss does what all school defendants do—runs away from the facts and tries to convince this Court that Mr. Doe is just mad because he lost a swearing contest.[1] But this case isn't about his having lost a swearing contest. It's about the fact that gender bias plausibly played a role in UIUC's bizarre decision here. How else to explain:

- Why, fewer than 10 minutes into the hearing, a supposedly impartial panelist asked why Mr. Doe was not facing even *more* charges, given that Ms. Roe had "struggled" since the "incident," ECF No. 1 ¶10;

- Why panelist Dean Die mockingly asked if Mr. Doe—a first-year business student—was well versed in trauma research after he argued that, if Ms. Roe had been assaulted, she would likely remember the date when it happened, *id*. ¶180;

- Why, after Ms. Roe's friend and witness S.A. testified that Ms. Roe changed her "really excited" tune about what happened only after Mr. Doe ghosted her, the hearing panel spent 80 percent of its questions for S.A. trying to prove that she was biased in favor of Mr. Doe, *id*. ¶232; and

- Why the panel never confronted Ms. Roe about the fact that two of her own witnesses, U.Z. and M.M., contradicted Ms. Roe's claim that she told them Mr. Doe assaulted her when they huddled together that same afternoon.

The panel's biased decision did not take place in a vacuum, but against a backdrop of intense internal and external pressure over UIUC's perceived mishandling of other allegations of

---

[1] Defendants criticize Mr. Doe for not attaching the investigation report to his Complaint, implying that he wants to hide it from this Court. ECF No. 27-1 at 8 ("The Complaint also quotes portions of testimony from the live hearing in his case. None of the referenced documents or transcript from the live hearing is attached to the Complaint."). This is misleading for two reasons. First, Defendants know that Mr. Doe was never given a hard copy of the report—only cloud access. Second, counsel for Mr. Doe *twice* asked counsel for Defendants for a hard copy to attach to his TRO—but counsel for Defendants never gave it, either before or after he filed. ECF No. 5-2 at 4 n.1 ("Mr. Doe's counsel sought the University's permission to file the Evidence Packet and a transcript of the audio recording in the morning on September 24, 2020. Counsel for Mr. Doe spoke with the University's counsel shortly before filing his motion today, and the University's counsel had not yet heard back from the University regarding its position on these documents. Mr. Doe would very much like this Court to see them and hopes that UIUC will either grant its consent or provide the documents itself when it responds to this motion.").

sexual misconduct by males. In addition to a national climate seeking to hold males accountable for sexual misconduct, UIUC in particular has been the subject of numerous media reports and lawsuits over its mishandling of such allegations. Because UIUC has been accused of improperly addressing allegations made against male students, professors, and administrators, it was incentivized to discriminate against Mr. Doe.

UIUC's actions also violated Mr. Doe's due process rights. As evidenced by the bias described above, Mr. Doe was denied an impartial fact-finder. His hearing was thus not a real one, but a sham. UIUC also improperly prevented Mr. Doe from attending the hearing with his adviser when it refused a reasonable scheduling request, thus denying him the benefit of the seasoned attorney who had assisted him throughout the investigatory process and forcing him to rely on his father, who had no legal training. That harm compounded the harm from UIUC's deficient cross-examination procedure, which forces parties to first submit their questions to the hearing panel—in this case, a hostile and biased one.

Mr. Doe thus respectfully asks the Court to deny Defendants' motion to dismiss and permit him to proceed to discovery in this case.

### **Factual Background**

Mr. Doe and Ms. Roe had been flirting for a few weeks when, on October 25, 2019, Mr. Doe invited Ms. Roe to lunch, and she accepted. After lunch, Ms. Roe invited Mr. Doe to her room. ECF No. 1 ¶58. When they got there, Ms. Roe and Mr. Doe began to kiss, and Mr. Doe eventually asked Ms. Roe if she wanted to have sex. *Id*. ¶59. Ms. Roe said she did. *Id*. At some point before having sex, Ms. Roe texted her roommate U.Z. to make sure she and Mr. Doe wouldn't be disturbed. *Id*. ¶58. Mr. Doe and Ms. Roe then began having sex. *Id*. ¶60. After some time, Mr. Doe asked if Ms. Roe would change positions, and she consented to that by both her

words and actions. *Id.* After having sex, Ms. Roe revealed to Mr. Doe that she had struggled with

mental illness and suicidal ideation. Mr. Doe became uncomfortable and soon told Ms. Roe he

had to leave. *Id.* After he left, Ms. Roe texted her roommate, U.Z., to tell her that their suitemates

heard Ms. Roe and Mr. Doe having sex. *Id.* ¶65 ("BITCH/I CANT BELIEVE/OUR

SUITEMATES HEARD"). A few hours later, Ms. Roe saw her friend and sorority sister S.A. at

a kickball tournament and told her that she and Mr. Doe "got together" and "I think he wants me

to go to semi with him." S.A. described Ms. Roe as "really excited about that." *Id*. ¶ 200. Mr.

Doe then didn't contact Ms. Roe or respond to Ms. Roe's messages for two weeks. *Id.* ¶¶107,

112. They saw each other in a class they were both in on November 7, 2020, when Ms. Roe told

Mr. Doe, "you ghosted me and never to talk to me again." *Id.* ¶108.

On April 24, 2020, six months after Ms. Roe's sexual encounter with Mr. Doe, she

reported that Mr. Doe had sexually assaulted her. *Id.* ¶66. Ms. Roe alleged that on October 18,

2019, Mr. Doe forcefully flipped her onto her stomach and penetrated her without consent. *Id.*

¶156. The University assigned two investigators who were tasked with drafting an investigation

report summarizing their findings. Although their Report did not come to any conclusions

regarding the veracity of Ms. Roe's claims, it included a section titled "Additional conflicting

statements," which highlighted four statements that conflicted with other evidence—three of

which were made by Ms. Doe, and all of which went to the heart of her allegations. *Id.* ¶¶71-72.

On August 13, 2020, the University held a hearing on Ms. Roe's allegations. *Id.* ¶137.

Shortly after it began, a panelist asked why Mr. Doe wasn't facing additional charges. *Id.* ¶144.

Later, Assistant Dean of Students Rony Die, a non-voting member of the panel, challenged

Mr. Doe for saying that if he had actually assaulted Ms. Roe, she would probably have

remembered the date it happened (which she had not). Dean Die made a point of emphasizing

that Mr. Doe, a first-year business student, was not an expert in trauma. *Id.* ¶180. The panel then allowed one of the investigators to question Mr. Doe, even though only panel members are allowed to do that under the University's Student Disciplinary Procedures (the "Policy"). *Id.* ¶176. The panel also betrayed its bias when S.A. testified. Although S.A. was Ms. Roe's sorority sister and friend, she told the investigators and the panel that Ms. Roe had changed her story over time—coming to view it negatively *only* after Mr. Doe stopped communicating with her. *Id.* ¶193. The panel asked S.A. ten questions, eight of which sought to undermine her credibility. *Id.* ¶197.

On August 18, 2020, UIUC issued its decision. The panel found that "it is more likely than not that the complainant told the respondent she was not comfortable switching over to her stomach." *Id.* ¶214. It gave three reasons for finding Ms. Roe credible and Mr. Doe not. First, even though Ms. Roe incorrectly reported that the sexual encounter with Mr. Doe occurred on October 18, 2019, she was correct that it happened on a Friday. *Id.* ¶217. The panel found it significant that Mr. Doe went to class before meeting Ms. Roe for lunch instead of watching a football game. Second, the panel found Ms. Roe more credible because Mr. Doe sat next to her in their shared class on November 7, 2019, which they said he wouldn't have done had he been uncomfortable with her mental health issues. *Id.* ¶219. Third, the panel found Ms. Roe credible because she told U.Z., M.M., and S.A. about the alleged assault, ignoring that the various stories Ms. Roe told her friends conflicted both with each other and with what Ms. Roe said she told them and when. *Id.* ¶221. The panel dismissed Mr. Doe from UIUC. *Id.* ¶1.

On August 25, 2020, Mr. Doe appealed the decision on three grounds: (1) Procedural error based on the panel's failure to objectively evaluate the evidence; (2) bias of the panel; and (3) disproportionate sanctions. *Id.* ¶229. The full weight of documentary and testimonial

evidence supporting Mr. Doe's evidence was contained in the appeal's 22 pages. The appeal adjudicators rubber-stamped the panel's findings on September 11th, responding to only one of his arguments (that the investigator shouldn't have been allowed to question him). *Id.* ¶235.

## Legal Standard

To survive dismissal, a complaint "must contain sufficient factual matter to state a claim for relief that is 'plausible on its face.'" *Hoffman v. Dewitt Cty.*, 176 F. Supp. 3d 795, 803 (C.D. Ill. 2016) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "Plaintiff's complaint must suggest a right to relief, 'raising that possibility above a speculative level.'" *Id.* (quoting *Kubiak v. City of Chicago,* 810 F.3d 476, 480 (7th Cir. 2016). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," but it is "not akin to a probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be the most plausible explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Doe v. Columbia Univ.,* 831 F.3d 46, 57 (2d Cir. 2016). In assessing a motion to dismiss, courts "'accept[] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Hoffman*, 176 F. Supp. 3d at 803 (quoting *Iqbal,* 556 U.S. at 678). This is because "[a] motion to dismiss serves to test the sufficiency of the complaint, not to decide the merits of the case." *Doe v. Bd. of Trs.of the Univ. of Ill.*, 2:17-cv-02180-CSB-EIL, ECF 34 at *6 (C.D. Ill. Oct. 10, 2017) (Bruce, J.).

## Argument

**I.**   **JOHN DOE HAS PLED SUFFICIENT FACTS FOR A TITLE IX CLAIM.**

Although they never quite come out and say it, Defendants appear to argue that there is some sort of multifactor test for determining gender bias in the Seventh Circuit: ECF No. 27-1 at 14 (citing an unpublished Eastern District of Wisconsin *summary judgment* opinion and saying

that "[t]hese factors reveal the absence of gender bias here."). But that is not the law. Courts in the Seventh Circuit instead ask a more straightforward question: whether a plaintiff has alleged facts sufficient to "raise a plausible inference that the university discriminated against [plaintiff] 'on the basis of sex.'" *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019). Mr. Doe easily clears this low bar. The hearing panel both exhibited bias and ignored swaths of evidence indicating Mr. Doe's innocence. Further, Mr. Doe's allegations were not made in a vacuum, but against a backdrop of significant pressure on UIUC "motivat[ing it] to discriminate against males accused of sexual assault." *Id*. at 669. When taken together, Mr. Doe's allegations of discrimination are, at a minimum, "plausible"—which is all they need be at this early stage.

### A.   The Panel Demonstrated Its Bias During Mr. Doe's Hearing

The Seventh Circuit has found that panel members' hostility toward accused students can indicate gender bias. *See id*. Here, Mr. Doe has alleged such targeted hostility quite clearly. Defendants argue that these examples don't matter because the panel members did not declare that they were engaging in gender discrimination  ECF No. 27-1 at 17 (criticizing "Plaintiff's reliance on a couple of comments at the hearing that have nothing to do with gender"). But that, quite sensibly, is not the law. As the Seventh Circuit recognized in *Purdue I*, the plausibility standard is satisfied where the plaintiff alleges both bias and reasons that such bias may have been gender-motivated. *Id*. Mr. Doe has amply pled both here. Defendants' position would also yield bizarre results. A school could decide to find all male students guilty, without even reviewing any evidence, and get away with that as long as no one spoke the real reason out loud.[2] Unsurprisingly, the Seventh Circuit has rejected such a limited framework for assessing claims

---

[2] To the extent that UIUC might respond that, in such a situation, a male student could bring a disparate impact claim, it is almost impossible to do that before the discovery phase. As far as Mr. Doe has been able to determine, UIUC does not make its student disciplinary data public.

of gender discrimination. *Id*. at 663, 669 (finding panel members' admissions that they had not even read the investigative report "suggest[ed] that they decided that John was guilty based on the accusation rather than the evidence" and supported his claim of gender discrimination).

Here, at the very outset of the hearing, one panelist revealed his bias when he asked the investigators why there weren't additional charges against Mr. Doe:

> Yeah. I had one question. So I reviewed the definitions this morning. And so I was just struggling with, if you could walk me through why sexual harassment was not charged in this case, just because of the many repeated instances where it seems that complainant has struggled in the university community since the incident. I wasn't sure. If you could just walk me through why that wasn't included.

ECF No. 1 ¶143. Defendants claim that this statement "conveyed no judgment whatsoever." ECF No. 27-1 at 17. If only. The panelist asked why more charges had not been brought specifically because "the complainant has struggled… since the incident." Imagine if, during a trial for battery, a juror asked why there were no charges for intentional infliction of emotional distress, adding that the plaintiff seemed to have been traumatized by defendant's actions. Further, whether there *was* an "incident" was what the panelist was *charged with deciding*, not something he was supposed to *accept as fact*—much less as a fact that had led the complainant to "struggle[]"—before even hearing the evidence. Of course this statement shows bias; here, following *Purdue*, it is plausible to infer at this stage that it shows *gender* bias.

Next, Dean Die betrayed his own bias when he questioned the basis for Mr. Doe's testimony that Ms. Roe's failure to remember the date of the incident called into question whether it was as significant as she had claimed:

> Dean Die: [Mr. Doe], I just want to follow up on that statement. As you speak about trauma, are you well versed in any research or data about how trauma affects anyone in any situation? I'm not talking about [Ms. Roe] in particular.
>
> Mr. Doe: No, sir. I'm not.

> Dean Die: Because I just wanted to see. So your statement, I guess, in regards to the complainant's ability to remember or not, is that an opinion or is that based in any kind of research that you have made?

> Mr. Doe: That is an opinion that I have. I believe she should remember the date.

ECF No. 1 ¶180. Defendants argue that these "questions merely expressed understanding of how [Mr. Doe's] assumptions run directly afoul of 'trauma-informed response' concepts." ECF No. 27-1 at 17. But that isn't the point. Maybe a "trauma-informed response" can explain why someone forgets the day they were supposedly assaulted, and maybe it can't. What matters is the fact that Dean Die *chose to ask this question at the hearing*, knowing full well that a freshman business major wouldn't be "well versed in any research or data" about trauma (or have access to UIUC's internal training on the topic). He did it to show up Mr. Doe—to undermine him. But he didn't apply anywhere near that kind of scrutiny to Ms. Roe's proven fabulations.

The panel also demonstrated its bias when it violated the Policy by allowing the investigator to question Mr. Doe during the hearing—once again, about his not getting the date right. ECF No. 1 ¶176. But the Policy didn't allow the investigator to do that. According to the Policy, the only role investigators have in a hearing is to "make a statement (if they choose) regarding the investigation" and take questions from the panel. ECF No. 27-1, Ex. 3 at 37. That's it. The investigator also didn't ask Ms. Roe a single question. A deviation from policy that goes against only the man, but not the woman, is suggestive of gender bias. *Norris v. Univ. of Colorado, Boulder*, 362 F. Supp. 3d 1001, 1012 (D. Colo. 2019) (finding deviations from procedures affecting only the male party to be indicative of gender bias).[3]

---

[3] *See also Lee v. Univ. of N.M.*, 449 F. Supp. 3d 1071, 1144 (D.N.M. Mar. 30, 2020) ("Several courts have concluded that failing to follow procedures supports an inference of bias."); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 950 (9th Cir. 2020) (violation of confidentiality procedures in campus Title IX process helped support an inference of gender discrimination); *Unknown*

Finally, the panel let its mask slip when questioning S.A., the most important witness in the case—and Ms. Roe's friend and sorority sister. S.A. testified that Ms. Roe's "attitude about the incident had shifted" only weeks later, after Mr. Doe had ghosted Ms. Roe. ECF No. 1 ¶¶8, 97. And even then, Ms. Roe didn't tell S.A. that Mr. Doe had *sexually assaulted* her, but simply that she was *uncomfortable* engaging in a particular sexual position with him. In fact, Ms. Roe specifically told S.A. that she "didn't say no or tell him to stop." *Id.* ¶121. In a case with no eyewitnesses and little documentary evidence, such exculpatory testimony by Ms. Roe's own friend, with whom she spoke just hours after the incident, should have torpedoed Ms. Roe's allegations. But instead of taking S.A. seriously, the panel attacked her. Of the ten questions they asked her, eight were intended to prove that she was biased in Mr. Doe's favor. *Id.* ¶197.

## B. The Panel's Perplexing Decision Was Evidence of Gender Bias.

It is a "matter of common sense" that the "merits of [a] decision itself," when it is "arguably inexplicable," may be strong evidence of bias. *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020); *Purdue I*, 928 F.3d at 669 (a "perplexing" basis of decision can support a claim of gender bias).[4] So too here, where the panel's "inexplicable" decision whitewashed Ms. Roe's

---

*Party v. Arizona Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2019 WL 7282027, at *13 (D. Ariz. Dec. 27, 2019) (that Title IX committee "violated its own procedural rules by issuing the expulsion letter without considering [plaintiff's] response to the new evidence discussed in [accuser's] final written submission" helped support an inference of gender discrimination); *Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 607 (S.D. Miss. Jan. 16, 2019) (Title IX coordinator allegedly excluding exculpatory evidence despite procedures requiring her to "compil[e] *all evidence*, including the testimony of various witnesses, into a report" helped support an inference of gender discrimination).

[4] *Doe v. Univ. of Ark. – Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020) ("Doe's complaint alleges both: a dubious decision in his particular case taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants."); *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016) ("When the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias.").

many credibility problems to find in her favor. *Cf. Doe v. Bd. of Trs. of the Univ. of Ill.*, 2:19-cv-02054-CSB-EIL, ECF 12 at *10 (C.D. Ill. Mar. 21, 2019 (Bruce, J.) (suggesting that a panel "ignor[ing] critical evidence" would support an erroneous outcome claim). It is telling that, although Defendants assert that the panel "devoted multiple paragraphs to addressing" what they charitably characterize as "variances" between Ms. Roe's account and other evidence, *they do not address the substance of these so-called "variances" at all*. ECF No. 27-1 at 16-17. Moreover, the panel's own explanation for its credibility determination was so plainly deficient as to itself constitute evidence of gender bias.[5]

### 1. The Panel's Decision Ignored Evidence Demonstrating Mr. Doe's Innocence.

The most significant documentary evidence in the entire case was the text message Ms. Roe sent her roommate U.Z. right after she and Mr. Doe had sex—because it clearly undermined the story she would later tell. In her interview, Ms. Roe told the investigators that she *immediately* told U.Z. that Mr. Doe had sexually assaulted her. But this is what she texted U.Z. right after the encounter: "BITCH/I CANT BELIEVE/OUR SUITEMATES HEARD." ECF No. 1 ¶158. That was a bemused blurt about loud sex, not a cry for help. No wonder, then, that Ms. Roe herself never shared it with the investigators—it came to light only when *U.Z.* produced it. Undeterred, the panel maintained that the "complainant told UZ about the incident shortly afterward." ECF No. 27, Ex. 5 at 2. But that was false: U.Z. told the investigators that the first time Ms. Roe said anything about sexual assault was *months later*, after they had returned home

---

[5] Here, as in their response to Mr. Doe's motion for a TRO, Defendants cite *Doe v. Univ. of Arkansas- Fayetteville*, No. 5:18-CV-05182, 2019 WL 1493701, at *11 (W.D. Ark. Apr. 3, 2019) in their favor—ignoring, for the second time in a row, that the Eighth Circuit *reversed* that case in part because the school's credibility determination was "unexplained and against the substantial weight of the evidence," *Univ. of Arkansas- Fayetteville*, 974 F.3d 865.

because of COVID-19. *Id*. ¶73. Before that, she said Ms. Roe had just been "upset afterwards that [Mr. Doe] did not mention [taking Ms. Roe to a dance]" again" and that no other changes in Ms. Roe's behavior or demeanor "st[u]ck out in [her] mind." *Id*. ¶129. Ms. Roe had also claimed that M.M. was there when she told U.Z. about the assault that day. *Id*. ¶164. But like U.Z., M.M. said that never happened: she told the panel that she "left before [U.Z.] got back because I think I went to get food with my roommate." *Id*. ¶166. Yet the panel never asked Ms. Roe, U.Z., or M.M. anything about the contradiction. *See Oliver v. Univ. of Tex. Sw. Med. Sch*., 2019 WL 536376, at *18 (N.D. Tex. Feb. 11, 2019) ("alleged lack of reference" to critical "exculpatory facts" in "the hearing" provided "particularized facts that satisfy his pleading burden of showing that gender was a motivating factor").

Ignoring the exculpatory texts and testimony of Ms. Roe's own friends wasn't the only ostriching the panel engaged in. It also ignored the evidence refuting Ms. Roe's claim that she was so distraught following the incident that she skipped class on October 31, 2019 to avoid seeing Mr. Doe. *Id*. ¶170. In fact, attendance records collected during the investigation demonstrated that Ms. Roe *did not miss a single class*. *Id*. ¶171. Yet the panel never asked her about that. It also failed to confront M.M. when she, like Ms. Roe, fabricated Ms. Roe's supposedly traumatized reaction to the encounter: "after it happened, Ms. Roe kind of shut down and didn't want to go out with our friends anymore and would really only see certain people, including myself and her roommate." *Id*. ¶211. But this was not true: as M.M. herself admitted when confronted with photographic evidence by Mr. Doe, she and Ms. Roe actually went to a party just two days later. *Id*. ¶212. And Mr. Doe later found (and submitted with his appeal) another photo from a *second* party from a *different* night that same week showing, yet again,

11

both of them going to a party. *Id.* ¶231. In no sense was Ms. Roe "shut down." Yet neither the panel nor appeals panel even mentioned this contradiction.

The panel also ignored substantial evidence that, contrary to Ms. Roe's denials, she was upset that Mr. Doe never contacted her after their encounter. Detective Murphy, who took Ms. Roe's initial statement, told UIUC investigators that "[i]n talking with [Ms. Roe], she thought this was leading to [a] long term relationship" and "definitely had an issue with being [ignored] afterward." *Id.* ¶132. More tellingly, U.Z. testified that Ms. Roe told her that she "thought it—it was weird how, like after that happened' like' [Mr. Doe], like, cut [Ms. Roe] off." ECF No. 19, Ex. 2, Attachment E at 63:19-21.[6] This was consistent with U.Z.'s statement to investigators that Ms. Roe was "upset afterwards that [Mr. Doe] did not mention [taking Ms. Roe to a dance] again." ECF No. 1 ¶129. And A.Z., yet another friend of Ms. Roe's, told investigators that Ms. Roe never mentioned Mr. Doe's assaulting her, but did complain that Mr. Doe would not respond to Ms. Roe's texts or Snapchat messages. *Id.* ¶112.[7] Once again, the panel mentioned none of this—or even questioned Ms. Roe about it.

Finally, the panel ignored Ms. Roe's shocking admission at the hearing that she gave verbal consent to sex with Mr. Doe, contradicting her earlier claims to the investigators. *Compare id.* ¶86 (describing her consent as "action based") *with id.* ¶149 ("And then he had asked me if it was okay that we do that. And I basically just said, Yeah, it's fine."). This about-face was particularly striking given that consent was at the heart of the case. And it wasn't the

---

[6] The panel's decision falsely asserted that "[b]oth witnesses[, M.M. and U.Z.,] reported . . . [Ms. Roe] made no mention that the complainant was upset about not hearing from the respondent." ECF No. 27-1, Ex. 5 (Decision Letter) at 3.

[7] Defendants claim that all relevant witnesses testified at the hearing, ECF No. 27-1 at 14, but that is false. A.Z. did not testify at the hearing, even though (or perhaps because) she was able to offer testimony undermining Ms. Roe's credibility and narrative.

only bold claim she walked back at the hearing. Whereas Ms. Roe initially characterized the intercourse with Mr. Doe as violent, *id.* ¶90 ("[Mr. Doe] forcibly turned me around and laid me on my stomach and continued to penetrate me," and she "felt trapped because [Mr. Doe's] hands were pushing down [on Ms. Roe] with force"), she said at the hearing that it actually "wasn't extremely aggressive," *Id.* ¶156. The panel ignored this change, too. *See Doe v. Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020) ("Likewise remarkable—in a proceeding in which the credibility of accuser and accused were paramount—was the failure of the hearing panel even to comment on the flat contradiction, expressly noted by [the investigator] at the hearing, between what [the accuser] told him during his investigation and what she said during the hearing, regarding whether [the plaintiff] 'asked' for oral sex.").

### 2. The Panel's Stated Rationale for Its Credibility Determination Was Evidence of Gender Bias.

Defendants say that the date of the incident was "very significant" because "it led Plaintiff to change his story about an entire series of events leading up to the sexual encounter." ECF No. 27-1 at 16. They place a curious amount of weight on a very weak argument. Six months after their encounter—a one-time hookup that meant little to Mr. Doe—Ms. Roe claimed that he had assaulted her. She gave UIUC the wrong date (Friday, the 18th), and UIUC conveyed that wrong date to Mr. Doe. Mr. Doe knew it couldn't have happened on that Friday, and it never occurred to him that Ms. Roe could be off by a full *week*. He assumed she must have just been off by a day and that it actually happened that Saturday. So he told the investigators what he did that Saturday before they got together and also what happened during their encounter. Once Ms. Roe admitted—after being confronted with her loud-sex texts to U.Z.—that her original date was wrong, Mr. Doe told UIUC what he'd done on *that* date before they met up. Even Defendants do not contend that he lied about the "before" part on either date; he didn't. He told the truth about

both "before" parts, and then he told the truth about the "during" part. But Defendants, as did the panel before them, somehow think it hurts his—and *only* his—credibility to have made a mistake that he was *prompted by Ms. Roe into making*. This makes no sense on its own terms—it was at worst a mistake of *memory*, not of *credibility*, akin to misremembering what color shirt Ms. Roe wore that day. Moreover, Defendants' holding the same mistake against him but not her is hard to interpret as anything *but* gender bias. That is doubly clear when viewed alongside, as noted above, the many inconsistencies on which the panel gave Ms. Roe a complete pass—which, unlike the date issue, had everything to do with credibility.

This was not the only neutral fact that the panel twisted to find Mr. Doe less credible than Ms. Roe. It also concluded that he was less credible because he spoke to Ms. Roe in class on November 7, 2019. According to the panel, this was inconsistent with Mr. Doe's "inten[tion] to cease communication with the [Ms. Roe] after discovering information about her mental health and suicide ideation." ECF No. 27-1, Ex. 5 (Decision Letter) at 3. Like the panel's wrong-date reasoning, this finding makes absolutely no sense. Mr. Doe never said that he wanted to "cease communication" with her in every way for all time. He just didn't want to get into a *relationship* with someone who had such a serious history of mental health issues. Sitting next to her in class didn't contradict that intention at all. But it tortures both the evidence and common sense to make *any* of this about Mr. Doe's credibility. The panelists did so anyway because they were biased, wanted to find him responsible, and had to reach for *something* in a case where the evidence pointed so strongly in the other direction.

The panel also revealed its gender bias in crediting only witnesses who favored Ms. Roe (all women) and ignoring the male witness (T.W.) who contradicted her. *See Baum*, 903 F.3d at

592.[8] T.W. emphatically refuted Ms. Roe's story that he made negative comments about how Mr. Doe treated women. ECF No. 1 ¶124. In fact, T.W. described Mr. Doe as a "role model." *Id.* ¶125. But the panel ignored T.W.'s testimony when assessing Ms. Roe's credibility.

Perhaps most striking of all was the panel's treatment of S.A.'s testimony. As noted above, S.A. testified that just hours after the incident, Ms. Roe told her at a kickball tournament that she and Mr. Doe had just had sex. S.A. described that conversation as follows:

> So in October, when [Ms. Roe] first told me what happened, we were at a pregame for our sorority and she was really happy that day. And then [Ms. Roe] was like, [S.A], guess what? And she's like, Me and [Mr. Doe] got together. And she's like, I think he wants me to go to semi with him. And she was really excited about that.

ECF No. 1 ¶200. To get around that inconvenient truth, the panel gave three unconvincing reasons to not credit S.A. First, it said it didn't believe S.A. because S.A. said Ms. Roe told her that she never said "no," while Ms. Roe said she did say "no," and Mr. Doe said she said "yes." This makes no sense on its face. S.A. was just reporting what Ms. Roe told her two weeks later when she finally started calling it assault. Moreover, that omission has nothing to do with *S.A.'s* credibility. Second, the panel found S.A. less credible because she disputed Mr. Doe's assertion that she "did not believe [Ms. Roe] and supported [Mr. Doe]." ECF No. 27-1, Ex. 5 (Decision Letter) at 4. But that is not true. S.A. told the panel that she told Mr. Doe that she "was going to tell, like, what I know to be the truth." ECF No. 19, Ex. 2, Attachment E at 74:16-21. That truth was what she testified to, and it was completely natural for Mr. Doe to interpret it as "support"— because it was. Finally, the panel discounted S.A.'s testimony because it believed Ms. Roe's

---

[8] Defendants over-read *Baum* when they argue that it turned on the hearing panel's crediting only *female* witnesses, not male witnesses. ECF 27-1 at 15. What mattered more was the panel's crediting all of the *female complainant's* witnesses, all of whom happened to be female. While a probative fact, it was not dispositive: surely *Baum* would have come out the same way if (say) one of the female complainant's witnesses had been male, or if one of the male respondent's witnesses had been female.

claim that she didn't feel like she could "open[ ] up to [S.A.] about the incident until she thought

they were closer friends and could trust her." ECF No. 27-1, Ex. 5 (Decision Letter) at 4. But

that, too, makes no sense, since *Ms. Roe is the one who brought the incident up*. If she didn't

"trust" S.A., wouldn't she have said *nothing at all*, rather than be "really excited" and volunteer

that she and Mr. Doe "got together" and that "I think he wants me to go to semi with him"?  ECF

No. 1 ¶200. The panel never asked her that.

### C.    UIUC's Discriminatory Behavior Took Place Against a Backdrop of Intense Pressure.

Mr. Doe's hearing took place against a backdrop that provides a "plausible" explanation

as to why UIUC was "motivated to discriminate against males accused of sexual assault."

*Purdue I*, 928 F.3d at 669. On top of the nationwide pressure common to all schools, UIUC

faced particular internal and external *local* pressure resulting from its mishandling of allegations

of sexual misconduct engaged in by males—giving the University a strong incentive to

discriminate against Mr. Doe on the basis of his gender.[9]

UIUC has faced a wave of negative publicity and lawsuits resulting from its alleged

failure to adequately respond to sexual misconduct allegations on campus. ECF No. 1 ¶¶41-50.

For example, just last year, *ProPublica* published a story titled "One Campus. Seven Professors

Facing Harassment Accusations. Few Consequences," recounting UIUC's failure to properly

---

[9] *See, e.g.*, *Neal v. Colorado State Univ.-Pueblo*, No. 1:16-cv-873, 2017 WL 633045 at *14 (D. Colo. Feb. 16, 2017) (refraining from deciding whether OCR pressure or procedural deficiencies alone could support inference of gender bias because "all of Plaintiff's allegations together," including "pressure to avoid DOE investigation and . . . procedural shortcomings" sufficed to support plausible inference of gender bias); *Collick v. William Patterson Univ.*, No. 16-471, 2016 WL 6824374 at **11-12 (D.N.J. Nov. 17, 2016) (allegations that female complainant's claims "were accepted as true without any investigation," that the plaintiffs were "not afforded a thorough and impartial investigation," and that OCR exerted national pressure on universities together supported plausible inference of gender bias).

address allegations of sexual misconduct. *Id*. at 43. The school has also been sued over its alleged failures and faced internal pressure from its mishandling of such cases. *Id*. ¶¶41-50. Defendants say none of that counts because it has to do with professors, not students. ECF No. 27-1 at 18. That is akin to arguing that a restaurant wouldn't feel pressure to apply stricter guidelines to the handling of *all* meat following a highly publicized *E. coli* outbreak because it was limited to chicken. Unsurprisingly, the only case Defendants cite for this curious proposition, *Doe v. Marian Univ.*, was a *summary judgment* case. No. 19-CV-388-JPS, 2019 WL 7370404 (E.D. Wis. Dec. 31, 2019). Little wonder that they would prefer *Marian* to cases in which courts denied *motions to dismiss* where the Plaintiff alleged gendered pressure regarding *students* due to the university's earlier mishandling of allegations involving *employees*.[10]

And indeed, UIUC *did* feel public pressure from its mishandling of misconduct allegations against male students. For example, in October 2019, a UIUC student went public with her story about how the school failed to appropriately respond to her claims that a male UIUC student physically abused her.[11] Defendants run away from this inconvenient fact, making no mention of it at all despite the incident and UIUC's failures being covered by multiple outlets. ECF No. 1 ¶50. Further, Defendants attempt to bury in a misleading footnote another allegation of UIUC's mishandling of misconduct allegations involving a male student. Defendants'

---

[10] *See, e.g.*, *Doe v. Univ. of Iowa*, No. 3:19-cv-00047 (S.D. Iowa, July 17, 2020) (finding that "negative media coverage in April 2017 related to a lawsuit against the University for gender discrimination against a female staff member" helped support inference of gender discrimination against accused student); *Harnois v. Univ. of Mass. at Dartmouth*, No. 19-10705, 2019 WL 5551743, at *5 (D. Mass. Oct. 28, 2019) (noting "that UMass Dartmouth's recent settlement of a costly gender discrimination lawsuit initiated by a female employee 'hypersensitized' UMass Dartmouth to 'suits by females filing Title IX discrimination complaints,' such that UMass Dartmouth was motivated to undertake preemptive and precipitous investigation of male students accused of Title IX misconduct").

[11] *See, e.g.*, JJ Kim, *Hana Inman-Grabow Fights for Personal Justice with Title IX*, THE DAILY ILLINI, Jan. 21, 2020, https://dailyillini.com/news/2020/01/21/inman-grabow-justice/.

assertion that Mr. Doe provided "[o]ne lone example of public scrutiny of the type of sanction applied many years earlier" is simply false. ECF No. 27-1 at 19 n.7. Mr. Doe provided multiple examples, one of which occurred very recently.

The pressure UIUC felt is illustrated by, among other things, its "ManTalks." Defendants object that the "ManTalks" do not have any *direct* link to Mr. Doe or his case. But that isn't the point. The "ManTalks" matter because they show that UIUC improperly assumes that men (and only men) are the ones who need to be talked to and about regarding sexual assault, fostering discussions around "ending violence against women and femmes, . . . intersectional feminisms, [and] consent."[12]  That suggests gender bias. *See*, *e.g.*, *Doe v. Case W. Reserve Univ.*, No. 1:17-cv-414, 2017 WL 3840418, at *6 (N.D. Oh. Sept. 1, 2017) (administrator's statements that college students, and "in particular women," were engaging in sexual risk-taking was evidence of gender bias at the pleading stage); *Doe v. Rider Univ.*, No. 3:16-CV-4882-BRM-TJB, 2020 WL 634172, at *11 (D.N.J. Feb. 4, 2020) (finding Rider Men's Project's focus on "prevent[ing] personal violence or abuse by exploring the male identity" provided an inference of gender bias in school's disciplinary proceeding).

## II.    JOHN DOE HAS PLED FACTS SUFFICIENT TO STATE A CLAIM FOR DENIAL OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.[13]

To satisfy the Due Process Clause, "'a hearing must be a real one, not a sham or pretense.'" *Purdue I* at 663 (7th Cir. 2019) (quoting *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016)). Mr. Doe's hearing was a sham, as "members of the [panel] came to the hearing having predetermined" Mr. Doe's guilt. *Dietchweiler*, 827 F.3d at 630. In addition

---

[12] *Men and Masculinities Programming*, Univ. of Ill., https://wecare.illinois.edu/prevention/students/men/ (last visited Sept. 21, 2020).
[13] Defendants' arguments regarding the sufficiency of the process afforded to Mr. Doe, ECF No. 27-1 at 8-10, are "better suited for summary judgment." *Doe v. Bd. of Trs. of the Univ. of Ill.*, 2:17-cv-02180-CSB-EIL, ECF 34 at *13 (C.D. Ill. Oct. 10, 2017) (Bruce, J.).

to gross displays of bias showing the panel's prejudgment of Mr. Doe's case, Mr. Doe was also

denied protections to which he was entitled. He was not permitted to be accompanied by his

adviser or to directly cross-examine Ms. Roe.

First, in sexual misconduct disciplinary proceedings, "[a]n impartial and unbiased

adjudicator is a fundamental part of due process." *Furey v. Temple Univ.*, 884 F. Supp. 2d 223,

255 (E.D. Pa. 2012). Although there is a presumption that administrators are fair, *Hess v. Bd. of

Trs. of S. Ill. Univ.*, 839 F.3d 668, 675 (7th Cir. 2016), Mr. Doe has "alleg[ed] facts sufficient to

overcome this presumption." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 601 (S.D. Ohio

2016) (describing how the presumption can be overcome through allegations of things like

"statements by board members or university officials indicating bias"). Mr. Doe has pled facts

showing that that UIUC did not give him an impartial panel—that it used the hearing to bolster

its preordained conclusion, not search for the truth. For example, as discussed above:

- At the start of the hearing, a panelist asked why Mr. Doe wasn't facing even more charges, given that Ms. Roe had "struggled" since the "incident";

- Dean Die tried to embarrass Mr. Doe for his lack of "trauma" knowledge simply for suggesting that someone who was really assaulted might remember *when*;

- The panel spent 80 percent of its questions for S.A. trying to prove that she was biased in favor of Mr. Doe; and

- The panel never asked Ms. Roe why U.Z. and M.M. contradicted her claim that she told them that very afternoon that Mr. Doe had assaulted her.

And as noted above, the panelists repeatedly ignored evidence undermining Ms. Roe's

credibility—further demonstrating that they were not impartial.

Second, UIUC also violated Mr. Doe's due process rights and its own procedures when it

denied Mr. Doe the ability to be accompanied by his adviser. After investigating Ms. Roe's

claims for nearly four months, UIUC informed Mr. Doe on July 30, 2020 that his hearing would

be held on August 13, 2020. ECF No. 1 ¶138. But Mr. Doe's adviser, an attorney, was due in court on another matter that day. *Id*. UIUC subsequently denied his reasonable request to reschedule the hearing. *Id*. As a result, instead of being accompanied by an attorney familiar with the facts of the case, Mr. Doe was accompanied by his father. To force Mr. Doe and his non-lawyer father, on short notice no less, to familiarize themselves with cross-examination strategy is patently unfair. As one court explained, it is "unfair when students are strangers to [a formal adjudicatory] process and rely entirely on what is told to them to inform their understanding of what they are up against. A reasonable juror could decide that it is not 'fair' to require a student who knows little or nothing to figure out what s/he does not know in order to ask productive questions." *Doe v. Johnson & Wales Univ.*, 425 F. Supp. 3d 108, 114 n.10 (D.R.I. Nov. 26, 2019).

Third, UIUC violated Mr. Doe's due process rights when it denied him the benefit of true cross-examination. Instead of being permitted to directly question Ms. Roe and her witnesses, Mr. Doe was required to submit questions to UIUC's biased panel. Cross-examination "allow[s] the accused to identify inconsistences in the other side's story," *Baum*, 903 F.3d at 581, and "gives the fact-finder an opportunity to assess a witness's demeanor and determine who can be trusted." *Id.* Absent "adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives." *Id.* at 582. All of this would have been particularly useful in a case like Mr. Doe's, where the finding of responsibility hinged on the panel's determination that Ms. Roe was credible and Mr. Doe was not.

## <u>Conclusion</u>

For the foregoing reasons, John Doe respectfully requests that Defendants' Motion to Dismiss his complaint be denied.

Respectfully submitted,

DATED:  November 13, 2020

By:  /s/ Justin Dillon

KAISERDILLON PLLC
Justin Dillon
Norman Anderson
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
Telephone: (202) 640-2850
Facsimile: (202) 280-1034
jdillon@kaiserdillon.com
nanderson@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of November, 2020, a copy of the foregoing

Memorandum of Law in Opposition to Defendants Motion to Dismiss the Complaint was served

on all counsel of record through the Court's CM/ECF.


/s/ Justin Dillon
Justin Dillon